**APRIL PRODUCTIONS, Inc., Plaintiff-Appellant,**

v.

**STRAND ENTERPRISES, Inc., Nat Harris, Louis E. Walters and Ben Yost, Defendants-Appellees.**

No. 87, Docket 23208.

United States Court of Appeals, Second Circuit.

Argued Jan. 5, 1955.

Decided March 28, 1955.

Klein & Lund, New York City, for plaintiff-appellant, Lionel S. Popkin and Adolph Lund, New York City, of counsel.

1. Doggett v. Chelsea Trust Co., 1 Cir., 1934, 73 F.2d 614.

A. Allen Saunders, New York City, for defendant-appellee, Yost.

Rivkin & Rosen, New York City, for appellees, Strand Enterprises, Inc., Nat Harris, Louis Rivkin, New York City, and Irwin Reicher, New York City, of counsel.

Before L. HAND and MEDINA, Circuit Judges, and DIMOCK, District Judge.

DIMOCK, District Judge.

April Productions, Inc., appellant, is the copyright owner of the musical production, "The Student Prince." Appellee Strand Enterprises, Inc., was licensee under an American Society of Composers, Authors and Publishers "small rights" license and owned a nightclub called "The Harem". Appellee Harris was an executive officer of Strand and manager of "The Harem". Appellee Yost was the leader of a choral group called "Ben Yost and His Royal Guardsmen". The songs of "The Student Prince" are in the ASCAP repertoire. Appellant concedes that, whatever the breadth of ASCAP's grant to Strand, appellant is bound by it. Appellees concede that any unlicensed performance by them of musical compositions from "The Student Prince" constitutes an infringement of appellant's copyright. Judge Goddard, sitting without a jury, found that there had not been any infringement of appellant's copyright. This appeal turns upon the license.

During the period relevant to this action "The Harem" presented twice nightly a show entitled "The One Thousand and Second Night". The program for this entertainment listed ten "scenes". The ninth of these was listed as "Ben Yost and His Royal Guardsmen". In this "scene" the choral group of which appellee Yost was the leader sang the words of certain songs, including a medley of songs from "The Student Prince". Appellant contends that appellees exceeded the scope of the license * in that (1) they presented songs from "The Student Prince" in a "dramatic" presentation, (2) they presented the songs in a medley despite the description of the licensed material as "separate compositions" and (3) they used the songs in violation of that part of paragraph 3(a) of the license which follows the semicolon therein and qualifies the use of fragments of instrumental selections.

We start with the fundamental proposition agreed to on all hands that the license permitted the performance of the songs with orchestral accompaniment and with the original lyrics rendered vocally. It may seem strange that such a fundamental question should require agreement of the parties but the form of the license is such that almost nothing is sure. In construing it, it seems to us that it will be useful to try to get some

---

* That part of the license material to this controversy reads as follows:

"(General)        NYC–3G18–N. Club

"Memorandum of Agreement between American Society of Composers, Authors and Publishers (hereinafter styled 'Society'), and Strand Enterprises, Inc. (hereinafter styled 'Licensee'), as follows:

"1. Society grants and licensee accepts for a period of One Year commencing 10/1/47 a license to publicly perform at The Harem, 1619 B'way, N.Y.C., and not elsewhere, non-dramatic renditions of the separate musical compositions copyrighted by members of the Society.

"  *        *        *        *

"3. This license shall not extend to or be deemed to include:

"(a) Oratorios, choral, operatic or dramatico-musical works (including plays with music, revues and ballets) in their entirety, or songs or other excerpts from operas or musical plays accompanied either by words, pantomime, dance, or visual representation of the work from which the music is taken; but fragments of instrumental selections from such works may be instrumentally rendered without words, dialogue, costume accompanying dramatic action or scenic accessory, and unaccompanied by any stage action or visual representation (by motion picture or otherwise) of the work of which such music forms a part.

"(b) Any work (or part thereof) whereof the stage presentation and singing rights are reserved."

idea of a consistent theory of the relationship created before attempting to apply the particular words to which the parties point to support their opposing contentions.

To begin with, we can safely assume that the parties contemplated that the licensed compositions would be performed in a nightclub. The form begins with the symbols, evidently placed there for the purposes of office routine, "N.Y.C–3G18–N. Club". It is fair to assume that this is a nightclub form. The back of the form contains blanks for information to be filled in. Opposite the words "seating capacity" the number 450 is inserted. There are spaces for check marks to indicate how the music is to be performed and the spaces opposite the words "orchestra" and "organ" are checked. There is another space for a yes or no check opposite the word "vocalist". While that is not checked there is, as above noted, agreement that the license covers vocal rendition of the songs. Other check marks indicate that there will be dancing and a floor show.

The license granted is described in paragraph 1 as a license to publicly perform "non-dramatic renditions of the separate musical compositions copyrighted by members of the Society." That grant can best be construed in the light of the other provisions of the license which in paragraph 3 describe what is not included in the license. The first nonincluded class is described as "oratorios, choral, operatic or dramatico-musical works (including plays with music, revues and ballets) in their entirety". That is a clear indication of the intention of the parties that permission to play and sing all the songs included in some work of another character does not give the right to perform the over-all work. Such a performance would, indeed, be the type form of a dramatic, as opposed to a "non-dramatic", rendition of the compositions licensed.

The next class of compositions which are declared to be outside of the terms of the grant are "songs or other excerpts from operas or musical plays accompanied either by words, pantomime, dance, or visual representation of the work from which the music is taken". Again it is agreed on all hands that this class has an accepted interpretation. The purpose of the words is to classify as outside of the license the use, with the licensed compositions, of other material from the over-all works from which the compositions are taken. It is conceded, however, that this prohibition does not apply to the lyrics of the songs whose performance is licensed. Again the purpose is clear to class as "dramatic" any of the author's material except the words and music of the song.

The final class of compositions expressly excluded from the grant is thus described: "but fragments of instrumental selections from such works may be instrumentally rendered without words, dialogue, costume accompanying dramatic action or scenic accessory, and unaccompanied by any stage action or visual representation (by motion picture or otherwise) of the work of which such music forms a part." While cast in the form of permission, the real force of these words is their prohibition. The works that are referred to are the over-all works that have just been discussed of which the licensed compositions form a part. It is significant that, while this class deals only with "instrumental" selections, the words impliedly prohibit the rendition of those instrumental selections with words, with dialogue, with costume accompanying dramatic action, or with scenic accessory. These limitations are not confined to any particular "words, dialogue, costume accompanying dramatic action or scenic accessory" but prohibit the addition to the instrumental rendition of these instrumental selections *any* words, dialogue, etc. The class of instrumental selections which may be instrumentally rendered is finally further qualified by the requirement that they must be "unaccompanied by any stage action or visual representation (by motion picture or otherwise) of the work of which such music forms a part."

It is important to note that, while instrumental selections may not be accompanied by any words, dialogue, etc., other excerpts have accompaniment forbidden only where it consists of words, pantomime, etc. "of the work from which the music is taken". Thus, so far as the express exclusory language of the grant is concerned, a song excerpted from a work such as "The Student Prince" may be rendered with "words, dialogue, costume accompanying dramatic action or scenic accessory".

The language of paragraph 3(a) of the license refers to the two classes of selections, non-instrumental and instrumental. It enumerates prohibitions of the use of each but omits in the case of non-instrumental selections and includes in the case of instrumental selections prohibition of "words, dialogue, costume accompanying dramatic action or scenic accessory". The omission of that prohibition in one case and its inclusion in the other is very close to an express statement that words, dialogue, etc. may accompany any non-instrumental selections. We thus have here an instrument which, on the one hand, describes the performance rights granted as "non-dramatic" but, on the other, in substance authorizes their exercise with "words, dialogue, costume accompanying dramatic action or scenic accessory". The scope of the license is not so narrow as if the "non-dramatic" limitation stood alone, or so broad as if the permission for "words, dialogue," etc. stood alone. Our problem is to determine whether the use here made of "The Student Prince" selections comes within the scope as thus defined. That will require a close examination of the facts.

Before examining the facts necessary to decide the principal question whether the compositions were used in a "dramatic" presentation contrary to the terms of the license, we shall briefly dispose of appellant's other two contentions. These other two contentions are the only ones where it is claimed that the presentation in any way violated any provision of the license other than its general limitation to non-dramatic use.

The first of these contentions is that the use of the selections from "The Student Prince", in a medley, violated a limitation implicit in the granting clause where the subject of the grant is described as a license to publicly perform renditions of the "separate" musical compositions copyrighted by members of the society. Whatever function, if any, the word "separate" may have in the license, it does not limit the permitted renditions to separate renditions. It is clear that the word "separate" modifies "compositions" and not "renditions". No rendition is outside of the license merely because it is part of a medley.

The second of these points founded upon particular provisions in the contract is that the presentation of these compositions violated the limitations placed by the license upon "fragments of instrumental selections". The short answer is that the license in dealing with "instrumental" selections referred only to such selections as in the original work were not accompanied by lyrics. No such selections are here involved.

We return to the fundamental question whether anything done with the licensed compositions by these defendants constituted a "dramatic" rendition.

Appellee Ben Yost and his Royal Guardsmen sang the medley from "The Student Prince" in scene 9, and only as a small part of scene 9, in the show entitled "The One Thousand and Second Night" presented at the nightclub. There were nine other scenes. Four of the other scenes had a Near-Eastern flavor. Scene 1 was entitled "The Magic City of Bagdad". It was evidently a street scene in which there appeared among the passersby "The Girl of the Casbah", "Water Carrier", "Snake Charmer", "Veiled Woman", "Girl of the Harem", and "Beggar". All of the entertainers appeared in this scene including Ben Yost and His Royal Guardsmen in oriental costume. They were mere

scenery, however, and did not do any singing. Scene 5 was entitled "Calling All Girls to the Harem" and billed among its performers "The Sheik of Araby" and "The Lovely Turkish Delights". Scene 7 was entitled "It's the Same Old Wiggle" and among the performers were there billed again "The Sheik" and "The Lovely Turkish Delights". Scene 10 was the last and was entitled "The Campbells are Coming to Cairo". There "The Sheiks" and "The Lovely Turkish Delights" appeared again with the entire company.

Besides these four Near-Eastern scenes and the scene in which Ben Yost and His Royal Guardsmen sang, there were five others which, like the Royal Guardsmen, had no Near-Eastern flavor. These scenes were "The Kanazawas, Oriental Dexterity", "Mack Triplets, Song Stylists", "Beatrice Kraft Company, Modern East Indian Ballet", "Elissa Jayne, The Harem Welcomes to Broadway a New Unusual Dancing Star" and "Martha Raye". The only connections that Ben Yost and His Royal Guardsmen had with the rest of the program were their appearance as part of the ensemble in the opening and closing numbers and their association with Martha Raye, their predecessor on the program. In her act, Yost and his Guardsmen sang with her and clowned with her. She introduced their act and during its last part came on with them again and, while they were not singing, participated in some way on her own account. She had no connection whatever with the medley from "The Student Prince".

■ Even if The Harem put on a dramatic performance, the selections from "The Student Prince" were not part of it. The worst that could be said would be that they were sung in an intermission between the acts of a dramatic performance. Such a rendition is "non-dramatic" within the meaning of the license. The word "dramatic" as there used cannot be stretched to cover it. The license, as concluded above, permits the rendition of non-instrumental compositions, such as were performed here, with "words, dialogue, costume accompanying dramatic action or scenic accessory" without their getting into the "dramatic" class. Those concomitants of the rendition would give it a much more dramatic tinge than its mere interjection as an entr'acte. From the use in this broad license of the bare word "non-dramatic" we cannot glean an intention to forbid such an interjection. There was no departure from the license.

■ Judge Goddard awarded attorneys' fees in the sums of $500 to counsel for appellees Strand and Harris and $500 to counsel for appellee Yost. Appellant contends that these fees were excessive. We cannot agree, and we believe that counsel for appellees Strand and Harris and counsel for appellee Yost are each entitled to an additional allowance of $500 for work on this appeal.

The judgment below is modified by the addition of an attorney's fee of $500 to each of appellees' counsel who filed a separate brief on this appeal and, as so modified, affirmed.