The **ROBERT STIGWOOD GROUP LIMITED** et al., Plaintiffs-Cross-Appellants,

v.

Betty **SPERBER**, individually and doing business as the Original American Touring Company and Betty Sperber Management, Inc., Defendants-Appellants.

No. 522, Docket 71-2057.

United States Court of Appeals, Second Circuit.

Argued March 3, 1972.

Decided March 17, 1972.

Robert C. Osterberg, New York City (Abeles and Clark, and John L. Eastman, New York City, of counsel), for plaintiffs-cross-appellants.

Robert L. Fitzpatrick, Los Angeles, Cal. (David S. Fitzpatrick, New York City, of counsel), for defendants-appellants.

Before MURRAH,* KAUFMAN and OAKES, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The rock opera *Jesus Christ Superstar* and several of its individual musical compositions have enjoyed large commercial success as well as substantial critical acclaim. More than two million records and tape cartridges of the full opera have been sold, the authorized touring production grossed over one million dollars in its first four weeks, and tickets to the Broadway version have been among the more difficult to acquire. We can understand, therefore, the desire of promoters and producers throughout the country to capitalize on the success of *Jesus Christ Superstar,* and it is not surprising that one consequence of its explosive yet impermanent popularity is litigation.[1] The role of the courts must be to prevent exploitation of the opera in a manner that infringes the rights of the creators of the work and their assignees.

**I.**

Timothy Rice wrote the libretto for *Jesus Christ Superstar* and Andrew Lloyd Webber composed the score of the opera's overture and 22 songs which depict the last seven days in the life of Christ. Rice and Webber assigned the rights in the work (except "King Herod's Song") to Leeds Music Limited which duly obtained United States copyrights for the opera as a "dramatico-musical composition" pursuant to 17 U.S.C. § 5(d) and for several of the individual

---

* Senior Circuit Judge, Tenth Circuit, sitting by designation.

1. Other cases involving alleged infringements of the copyrights in *Jesus Christ Superstar* include:
   Rice v. American Program Bureau, 446 F.2d 685 (2d Cir. 1971);
   The Robert Stigwood Group Limited v. Hilton Hotels Corp., 71 Civ. 3391 (S.D.N.Y.1971);
   The Robert Stigwood Group Limited v. Hurwitz, 71 Civ. 5466 (S.D.N.Y. 1971);
   The Robert Stigwood Group Limited v. Lipsitz, No. 7–C–272 (E.D.Wisc. 1971);
   The Robert Stigwood Group Limited v. Superstar Productions, Civ. Action No. 1047–71 (D.C.Cir. 1971);
   The Robert Stigwood Group Limited v. Superstar Productions, Civ. Action No. 71–C–261 (E.D.Wisc.1971), affirmed No. 71–1423 (7th Cir. 1971);
   The Robert Stigwood Group Limited v. Superstar Productions, Ltd., No. 71–C–319 (E.D.Wisc.1971);
   The Robert Stigwood Group Limited v. Mid-America Rock Organization, No. P3301 (S.D.Ill.1971);
   The Robert Stigwood Group Limited v. Miami Hollywood Sportatorium, Civ. Action No. 71–1780–JE (S.D.Fla. 1971).

songs as "musical compositions" pursuant to 17 U.S.C. § 5(e). Leeds Music Limited assigned the United States copyrights to Leeds Music Corporation. The Robert Stigwood Group Limited ("Stigwood") acquired the rights for stage productions and dramatic presentations of the opera, and its rights are those allegedly infringed. Defendant Betty Sperber is a booking agent doing business as "The Original American Touring Company" ("OATC") and concerts presented by it are represented as being performed by The Original American Touring Company. The business details of the concerts are handled by Betty Sperber Management of which Sperber is President. Each OATC so-called concert consists of 20 of the 23 songs from *Jesus Christ Superstar,* sung sequentially with one exception, and three additional religious works. Sperber avers that other programs not involving *Jesus Christ Superstar* are planned by OATC.

Stigwood brought this suit, *inter alia,* to enjoin: one, OATC's performance of *Jesus Christ Superstar* or portions thereof; two, any references to *Jesus Christ Superstar* in advertisements for OATC performances; and three, use of the name The Original American Touring Company. The district court's preliminary injunction, 332 F.Supp. 1206, issued pursuant to 17 U.S.C. § 112, barred only the references to *Jesus Christ Superstar* in OATC advertisements, and both parties appealed.

OATC's claim that its productions do not infringe Stigwood's rights is based upon the usual and customary agreement between the American Society of Composers, Authors and Publishers ("ASCAP") and Leeds Music Corporation, an ASCAP member. Although a complete description of the purpose of ASCAP and its methodology are unnecessary to our decision, some understanding of its function is vital to an examination of the agreements it makes with its members. The Copyright Act of 1909 granted several rights to the holders of copyrights in works including the exclusive right "to perform the copyrighted work publicly for profit if it be a musical composition." 17 U.S.C. § 1(e). Composers and publishers soon realized it was impractical for each copyright holder to attempt to enforce this right since he could not possibly police all public performances for profit of every musical composition throughout the United States. ASCAP was formed to meet this need. By obtaining licenses from its members, this organization, staffed for the purpose, could enforce the performing rights of its members. It was believed, however, that each copyright owner could appropriately police and license performances of musical comedies or operas because of the relative infrequency of such productions and the lengthy preparation and publicity which must precede these productions. *See,* Nimmer, "Copyright 1955," 43 Cal.L. Rev. 791, 798 (1955).

In any event, ASCAP is authorized by its members to license only nondramatic performing rights of compositions in its repertory. Consequently, pursuant to the standard ASCAP agreement utilized here, ASCAP was authorized by Leeds to give:

> 1. (b) The non-exclusive right of public performance of the separate numbers, songs, fragments or arrangements, melodies or selections forming part or parts of musical plays and dramatico-musical compositions, the Owner reserving and excepting from this grant the right of performance of musical plays and dramatico-musical compositions in their entirety, or any part of such plays or dramatico-musical compositions on the legitimate stage.

Thus, while ASCAP licensees[2] can perform the individual songs from *Jesus*

---

2. Stigwood also makes the claim that some of the promoters with whom Sperber has dealt and who are planning to present OATC performances have not obtained ASCAP licenses. Such performances, of course, would be improper. But, no such promotor is a defendant to this action, nor is a resolution of this claim essential to our ruling. In any event, OATC insists that it undertakes to ensure that the

*Christ Superstar,* whether copyrighted individually or merely as part of the opera as a whole, paragraph 3 of the standard license indicates that it does not extend to presentations of:

(a) Oratorios, choral, operatic, or dramatico-musical works . . . in their entirety or songs or other excerpts from operas or musical plays accompanied either by word, pantomime, dance or visual representation of the work from which the music is taken; but fragments or instrumental selections from such works may be instrumentally rendered without words, dialogue, costume, accompanying dramatic action or scenic accessory and unaccompanied by any stage action or visual representation (by motion picture or otherwise) of the work of which such music forms a part.

Both parties and the court agree, therefore, that selections from *Jesus Chirst Superstar* can be properly presented by ASCAP licensees if they are presented in "nondramatic" performances. *See generally,* M. Nimmer, Copyright § 125.6 (1971). Accordingly, we must decide if OATC's performances fall into the "dramatic" or "nondramatic" category.

The Copyright Act distinguishes between "musical" and "dramatico-musical" works.[3] The former are infringed only by public performances for profit whereas the latter are infringed by any public performance. *Compare* 17 U.S.C. § 1(d) *with* 17 U.S.C. § 1(e). In our effort to find some guidance in distinguishing between musical and dramatico-musical productions, we were soon to learn of the dearth of cases on the subject. We received some aid, however, from Judge Learned Hand's statement that a performance in "words and music alone may constitute a dramatic performance, and it did not matter that the performance was only of a scene or part of a scene." Herbert v. Shanley, 222 F.

344, 345 (S.D.N.Y.1915) (citations omitted), affirmed, 229 F. 340 (2d Cir. 1916), reversed on other grounds, 242 U.S. 591, 37 S.Ct. 232, 61 L.Ed. 513 (1917). The Supreme Court's reversal of *Herbert,* however, nipped this line of cases in the bud by construing the "for profit" language so liberally that it obviated the need for further litigation over what was "dramatic" or "nondramatic." 242 U.S. at 594–595, 37 S.Ct. 232.

The only case cited to us which discusses the scope of the ASCAP license is April Productions, Inc. v. Strand Enterprises, Inc., 221 F.2d 292 (2d Cir. 1955). In *April* the copyright owner of *The Student Prince* sued the proprietor of a cabaret, "The Harem," for infringement based upon performances there of a medley of songs from *The Student Prince.* The medley was a small part of one of ten scenes of the nightclub's show, and was not connected by a story line or otherwise. The Court stated:

Even if The Harem put on a dramatic performance, [the entire show of ten scenes], the selections . . . were not part of it. The worst that could be said would be that they were sung in an intermission between the acts of a dramatic performance. Such a rendition is "nondramatic" within the meaning of the license.

221 F.2d at 296. In the opinion, Judge Dimock (District Judge, sitting by designation), laboring without guidance or precedent, of course, was unable to cite us to a single authority.

In any event, Strand's use of several songs from *The Student Prince* pales by comparison with Sperber's use of almost the entire score from *Jesus Christ Superstar.* The twenty musical compositions from *Superstar* were almost the entire OATC performance rather than less than one-tenth as in "The Harem" club's show. Moreover, *April* has been

promoters of its shows obtain ASCAP licenses. Such licenses are, of course, non-exclusive and are readily obtainable. *See* United States v. American Society of Composers, Authors and Publishers,

Civil Action No. 13–95 (1941), Amended Consent Decree, 1950.

3. Dramatico-musical works are considered dramas for the purpose of 17 U.S.C. § 1(d). See 37 C.F.R. § 202.7 (1972).

severely criticized as inadequately protective of and virtually extinguishing dramatic performing rights with respect to musical compositions. As Professor Nimmer puts it:

> Under the rule of this case one could by simply obtaining an ASCAP license perform in a new musical play all of the music from "South Pacific" providing the "book" for the new production is not borrowed from "South Pacific." The ASCAP membership could hardly have intended to permit the performance of their musical compositions in Broadway musicals or similar productions in return for mere payment of the ASCAP fee.

M. Nimmer, Copyright § 125.6 (1971).

■ Where the defendant has not even supplied a *new* "book" in its performances, a determination that dramatic rights have been infringed would seem simple. But, OATC asserts that plaintiff's "book" is not used either and insists that there is no story line whatever to defendant's performances. Recently, in Rice v. American Program Bureau, 446 F.2d 685 (2d Cir. 1971) a panel of this court in a 2–1 decision, favored this contention of defendants. *Rice* also dealt with performances of *Jesus Christ Superstar* allegedly executed pursuant to the ASCAP license. Because of the sparse record before it, the majority was unable to conclude that the performance was "dramatic." It did however, make clear that "presentation of all of the songs from the opera *Jesus Christ Superstar* without costumes, words, or scenery, but in sequence could arguably develop the overall plot of the opera, and . . . might possibly be 'dramatic'." *Id.* at 690. We have come to the conclusion that the fuller record before us establishes that a dramatic story is developed by defendant's productions, as Judge Smith in his dissenting opinion in *Rice* would have found and District Judge Motley did find even on the skimpier record there.

The facts before us vividly paint the dramatic nature of OATC's performance. Nowhere has Sperber disputed the accuracy of Stigwood's Exhibit 3 which is a program of one of OATC's concerts. A comparison between this exhibit and Exhibit 4,[4] which is the list

4. *Exhibit 3 lists songs as follows:*

| *Exhibit 3 lists songs as follows:* | *Exhibit 4 lists songs as follows:* |
| --- | --- |
| Overture | Overture |
| Heaven on their Minds | Heaven On Their Minds |
| What's the Buzz? | What's the Buzz |
| Strange Thing Mystifying | Strange Thing Mystifying |
| | Everything's Alright |
| | This Jesus Must Die |
| | Hosanna |
| Simon Zealotes | Simon Zealotes/Poor Jerusalem |
| Pilate's Dream | Pilate's Dream |
| The Temple | The Temple |
| | Everything's Alright |
| I Don't Know How to Love Him | I Don't Know How to Love Him |
| This Jesus Must Die | |
| Damned For All Time | Damned For All Time/Blood Money |
| The Last Supper | The Last Supper |
| Don't Go | |
| The Lord's Prayer | |
| Gethsemane | Gethsemane |
| The Arrest | The Arrest |
| Peter's Denial | Peter's Denial |
| Pilate and Christ | Pilate and Christ |
| King Herod's Song | King Herod's Song |
| He's Gone | |
| Judas' Death | Judas' Death |
| Trial Before Pilate | Trial Before Pilate |
| Superstar | Superstar |
| The Crucifixion | Crucifixion |
| | John Nineteen: Forty-One |

of songs incorporated in the recording of the opera,[5] establishes that 20 of 23 *Superstar* selections are performed in defendant's concert, all but one in identical sequence as in the copyrighted opera. The conclusion is inescapable that the story of the last seven days in the life of Christ is portrayed in the OATC performances substantially as in *Superstar*. One might appropriately ask why, if OATC did not intend that the same story be told, would it insist on preserving the sequence of the songs presented in *Jesus Christ Superstar*, which when performed in that fashion, tell the story even in the absence of intervening dialogue? As *Rice* instructed, the lack of scenery or costumes in the OATC production does not *ipso facto* prevent it from being dramatic.[6] *See* Shafter, Musical Copyright 57 (2d Ed. 1939). Indeed, radio performances of operas are considered dramatic, because the story is told by the music and lyrics. *See* Finkelstein, "Public Performance Rights in Music and Performance Rights Societies," 7 Copyright Problems Analyzed 69, 77 (1952); *see also* "Radio Music," Music Lovers' Encyclopedia 809 (Rev. Ed.1954). There can be no question that the OATC concerts, in which singers enter and exit, maintain specific roles and occasionally make gestures, and in which the story line of the original play is preserved by the songs which are sung in almost perfect sequence using 78 of the 87 minutes of the original copyrighted score, is dramatic. And, the admitted desire of defendants to make reference to the opera in its advertisement provides further evidence that the performance is intended to come as close as possible to the original dramatico-musical. *See* M. Nimmer, Copyright § 34 (1971).

Once we have concluded as we do, that Stigwood will probably succeed at the trial in establishing that OATC's concerts infringe Stigwood's copyrights, we must modify the preliminary injunction below to prevent further infringing performances, if irreparable injury will result. Further, once a prima facie case of infringement has been made out, a preliminary injunction should issue, even in the absence of a detailed showing of irreparable injury where dramatico-musical works are concerned, since "a copyright holder in the ordinary case may be presumed to suffer irreparable harm when his right to the exclusive use of the copyrighted material is invaded." American Metropolitan Enterprises of New York v. Warner Bro. Records, Inc., 389 F.2d 903, 905 (2d Cir. 1968). See *Rice, supra*, 446 F.2d at 688; Rushton v. Vitale, 218 F.2d 434 (2d Cir. 1957); Chappell & Co. v. Fields, 210 F. 864 (2d Cir. 1914).

Fashioning the injunctive provisions in the instant case presents complexities we should explicate. It would not be sufficient merely to enjoin further concerts which follow the format set forth in Exhibit 3. Simply making insignificant changes in sequence that would still not materially affect the performance we have described or interfere with the development of the story, would not be sufficient. Nor would a simple limitation on the number of selections which could be performed suffice. Even the presentation of five or six songs could under certain circumstances, develop an essential portion of the drama, for example, the last two days in the life of Christ, thus infringing on a part of the opera. The sequence of the songs seems to be the linchpin in this case. If the songs are not sung in sequence., i.e., no

---

5. The copyrighted score and libretto contain music and lyrics for an overture and 22 songs without intervening dialogue. The authorized recorded version faithfully reproduces the work on two records with a total playing time of 87 minutes and 16 seconds.

6. Professor Nimmer states that "a performance of a musical composition is dramatic if it aids in telling a story; otherwise it is not." M. Nimmer, Copyright § 125.6 (1971). The presence or absence of scenery and costumes is not of paramount importance in making such a determination.

song follows another song in the OATC concert in the same order as the original opera, and there are no costumes, scenery, or intervening dialogue, we are confident that the resulting performance could not tell the story of *Jesus Christ Superstar*.

## II.

In view of our disposition of the primary issue in this case and the accompanying discussion, our resolution of the remaining issues may be of only academic interest. Nevertheless, we feel obliged to affirm the conclusion reached below and in *Rice* that defendants cannot make reference to *Jesus Christ Superstar* in its advertisements. Sperber argues that there can be no copyright in titles, and, for the first time on appeal, claims that no protection can be afforded on any other theory because of Supreme Court decisions in Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S. Ct. 784, 11 L.Ed.2d 661 (1964) and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L. Ed.2d 669 (1964). We disagree. *Sears* and *Compco* prevent protection outside of the copyright laws, of works which Congress could have protected but chose not to. It may be that titles are not "writings" in the constitutional sense and thus cannot be protected by copyright but can be protected under unfair competition doctrine. In any event, *Sears* and *Compco* carved out a specific exemption for trademarks and labels of products which can be protected to prevent deception of the public. That is precisely the situation we have here. Thus, while Sears could manufacture a pole lamp identical to Stiffel's, it could not call it a Stiffel pole lamp. Similarly, OATC may perform songs under the ASCAP license but may not indicate that they are from the opera. The Senate Judiciary Committee, in its proposed general revision of the Copyright Law, preserves the right to regulate deceptive trade practices outside of the copyright laws. S. 543, § 301(b) (3), 91st Cong., 1st sess. (1969). Since the title *Jesus Christ Superstar* may well be associated with the opera as a whole and thus a "secondary meaning" has developed, we agree with the district court that defendants must be enjoined from directly or indirectly advertising or in any way representing any presentation as being from *Jesus Christ Superstar* or any song, instrumental selection or excerpt as taken therefrom in whole or in part. We also agree, however, that subject to the conditions we have set forth in Part I, the individual song titles can be listed.

## III.

Finally, although we do not doubt that the defendants chose the name "The Original American Touring Company" with the hope of misleading the public, we agree with the district court that there is insufficient evidence in the record to support an inference of likelihood of confusion strong enough to underpin a preliminary injunction to restrain the use of that name, provided the restrictions we have set forth are observed. *See* Remco Industries, Inc. v. Toyomenka, Inc., 286 F.Supp. 948 (S.D. N.Y.1967), affirmed 397 F.2d 977 (2d Cir. 1968). The likelihood of confusion is especially slight in view of the inability of OATC to make reference to *Jesus Christ Superstar* in its promotional efforts.

The preliminary injunction is modified and it is ordered that defendants be enjoined from:

(1) performing any song in such a way as to follow another song in the same order as in the original *Jesus Christ Superstar* opera;

(2) performing any songs from the opera accompanied by dramatic action, scenic accessory or costumes; and

(3) advertising or in any way representing any presentations as being from *Jesus Christ Superstar* or any song, instrumental selection or excerpt as taken therefrom in whole or in part.

The preliminary injunction is modified as we have indicated. The mandate shall issue forthwith.