**WALT DISNEY PRODUCTIONS, a corporation, Plaintiff,**

v.

**ALASKA TELEVISION NETWORK, INC., a corporation, James C. Stevens, Alaska Television Network, Skagway, Inc., a corporation, Alaska Television Network, Kodiak, Inc., a corporation, Video Tape West, Inc., a corporation, Cordova Cable System, Inc., a corporation (formerly Alaska Television Network, Cordova, Inc., a corporation), Alaska Television Network Petersburg and Wrangell, Inc., a corporation, Kodiak Telecable, Inc., a corporation, Herchel Cary and B–C Cable Company, a corporation, Defendants.**

Civ. No. 7273.

United States District Court,
W. D. Washington, N. D.

Nov. 17, 1969.

Bogle, Gates, Dobrin, Wakefield & Long, Thomas L. Morrow and Ronald T. Schaps, Seattle, Wash., for plaintiff.

Karr, Tuttle, Campbell, Koch & Campbell, John F. Kruger and Douglas F. Graham, Seattle, Wash., for defendants B–C Cable Co. and Herchel Cary.

Riddell, Williams, Voorhees, Ivie & Bullitt, Stephen E. DeForest, Seattle, Wash., for all other defendants.

## MEMORANDUM OPINION

WILLIAM N. GOODWIN, District Judge.

Plaintiff in this action seeks a permanent injunction and damages for infringement by defendants of certain copyrights of motion picture photoplays owned by the plaintiff which appeared in Walt Disney's ZORRO and WONDERFUL WORLD OF COLOR television series. This action is but one of a series of similar actions against these defendants. Defendants deny that there was any infringement of plaintiff's copyrights.

The facts of the case are not seriously in dispute, only the legal conclusion to be drawn therefrom is contested. The facts show that the defendants, through Video Tape West, Inc., and through Herchel Cary, took certain electromagnetic signals broadcast by television stations located in Seattle and Tacoma, Washington by means of a television receiving antenna, and recorded those signals, after some modification, on an electromagnetic tape known as video tape. The process used was simple. The broadcast signals were intercepted by an antenna, transferred by wire to a "demodulator-modulator" network which made the signals compatible with the videotape machine. The signals were then amplified and transferred to the video tape. The transfer to the tape causes the innumerable microscopic iron oxide particles embedded in the tape to take on a peculiar magnetic charge. The magnetic pattern so established is capable of being read or sensed by a device similar to the one which placed the pattern. The result of the "reading" is a varying electromagnetic current identical to the current in the machine which did the recording. The current so obtained can be reconverted to the original signal intercepted by the antenna or to some other signal compatible with the later receiving equipment.

The end of all of these electromagnetic machinations is the television receiving set of a prospective viewer.

In the present case, the recorded video tape was transported to Juneau, Alaska, and the signals emanating from the "reading" machine were caused to travel along the coaxial cable owned and maintained by B–C Cable to the residents who "subscribed" to that service.

The plaintiff contends that the actions of the defendants violated its rights under the laws of the United States, particularly 17 U.S.C. § 1 and subsection (d) thereof. In describing the exclusive rights of the copyright owner, subsection (d) provides in part:

"* * * [T]o make or to procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, performed, represented, produced, or reproduced; and to exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever; * * *."

The defendants contend that their operations are, in effect, the same as those considered by the United States Supreme Court in Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968). That case dealt with alleged infringement of a copyright by the community antenna television (CATV) systems owned and operated by Fortnightly. The systems owned by Fortnightly are described in detail by District Judge Herlands in United Artists Television, Inc. v. Fortnightly Corporation, 255 F.Supp. 177 (D.C.S.D.N.Y.1966). See also United Artists Television, Inc. v. Fortnightly Corporation, 377 F.2d 872 (2d Cir. 1967).

The essential difference between the system under examination in *Fortnightly* and that being examined here is the time or storage element. The velocity of electromagnetic signals, either through a metal cable or through any other compatible medium is known by all to be rela-

tively high. The time lapse between the input of a signal and the output of the same, or the resulting, signal is not capable of being sensed with normal human perception—it requires other electronic equipment. In the *Fortnightly* system, the time lapse between the transmitting of the television "carrier waves" by the television broadcasting station and the receipt of the corresponding electronic impulses by a subscriber via his televisions set was, to exaggerate, minimal. All of the *electronic operations* carried out by the defendants' systems are also carried out essentially instantaneously. However, defendants' systems must be separated into a "recording" system and a "playing" system. (The two words in quotes are used for designation only, not characterization.) Between the passage of any particular electronic impulse through the "recording" system and the "playing" system, there passed on the average, one week of time. During that time, the electronic impulses were stored in the character of the magnetic patterns of the video tape mentioned above.

The defendants, through able counsel, contend that the time spent by the electronic impulses on the tape must be likened to the time spent by the *Fortnightly* impulses in their passage through a "WCON" converter or "Channel Commander" unit, or the transformation of any electrical impulse undergoing any of the myriad of processes now used in communications.[1]

While the defendants' argument that the character of the impulses is not changed in any way different from the changes occasioned in the *Fortnightly* system may be true, it overlooks the reali- ty of the situation in light of the statute quoted above. The "recording" system used by the defendants captured the impulses and put them in such form that they were capable of being perceived, with proper equipment, innumerable times, and after any passage of time, subject only to the limitations imposed by the characteristics of the plastic tape upon which the iron particles were mounted. Defendants could hardly contend that it would not be an infringement of copyright for one to receive the broadcast of a copyrighted song by way of a radio, record it on a master disc, and then play it over another radio station or "Musak" system. In both this case and in the illustration the "record" is capable of retaining the imprinted material relatively indefinitely. While the defendants did not make the video tapes available on a widespread basis, the tapes were *capable* of being sold to any cable television system with the proper equipment. Such a distribution could, and no doubt would, be in direct competition with the owner of the copyrighted material contained, albeit hidden, therein.

The preparation of the video tapes of the copyrighted materials infringed upon the rights of the copyright owner under 17 U.S.C. § 1(d), and the dissemination of the programs through the defendants' cable system also constitutes an infringement. Whether or not the dissemination constitutes a "performance" as the word is used in the above section is immaterial.

The above opinion shall constitute the findings of fact and conclusions of law. Judgment is to be submitted in accordance therewith.

1. In passing, it is noted that the defendants' electronic impulses took a week to get from Seattle to Juneau while it took less than 2 seconds for the Apollo electronic signals to reach the earth from the moon.