ENCYCLOPAEDIA BRITANNICA EDUCATIONAL CORPORATION, Learning Corporation of America and Time-Life Films, Inc., Plaintiffs,

v.

C. N. CROOKS, Joseph S. Plesur, William Moorman, George Mueller, Richard E. Forrestel, Richard M. Pfeiffer, Frederic Sievenpiper, John Stovall, Theodore H. Ertel, Alvin J. Kraebel and Board of Cooperative Educational Services, First Supervisory District, Erie County, Defendants.

No. Civ–77–560.

United States District Court,
W. D. New York.

Feb. 27, 1978.

Raichle, Banning, Weiss & Halpern, Buffalo, N.Y. (R. William Stephens, Buffalo, N.Y., of counsel), for plaintiffs.

Ellis, Kustell & Mullenhoff, Buffalo, N.Y. (Carl B. Kustell, Buffalo, N.Y., of counsel), for defendants.

CURTIN, Chief Judge.

The plaintiffs are three corporations engaged in the business of producing, acquiring, and licensing educational motion picture films. On October 19, 1977, the plaintiffs filed this copyright infringement suit against the Board of Cooperative Educational Services of Erie County [BOCES], a nonprofit corporation organized under the Education Law to provide educational services to the public schools in Erie County. The complaint alleges that BOCES has videotaped a number of their copyrighted films without their permission and distributed the copies to the school districts for delayed viewing by the students. The plaintiffs demand that the defendants be enjoined from videotaping copyrighted films and they seek both actual and statutory damages for past infringement. They also request an award of costs and fees, and the surrender or destruction of all infringing copies of the films.

At the time of filing the complaint, the plaintiffs moved for a temporary restraining order to prevent the destruction of the existing videotapes and records pertaining to the tapes in BOCES' possession pending a final decision in the case, and also to obtain accelerated discovery privileges. This motion was granted by the court, upon the plaintiffs' agreement to post a $10,000 bond to indemnify the defendants against possible loss. Both parties proceeded to engage in preliminary discovery.

The case is now before the court on the plaintiffs' motion for a preliminary injunction. The plaintiffs seek to temporarily enjoin the defendants from videotaping plaintiffs' copyrighted motion pictures from television broadcasts, recopying the videotapes, distributing these tapes to the school districts, displaying the copies in classrooms, and transmitting the videotaped films to the schools over closed-circuit television cables. A hearing on the motion was held on December 27, 1977, at which the attorneys agreed not to call witnesses in connection with the motion but to rely on filed affidavits, exhibits, memoranda of law, depositions, and oral argument.

All three of the plaintiffs are engaged in the business of producing, acquiring, and licensing educational audiovisual materials. Although the percentage varies among the three, all derive substantial income from the sale and licensing of copyrighted educational motion pictures, both to television networks and to educational institutions. Each of the plaintiffs owns copyrights to some of the films on which this infringement suit is based.

Since 1969, plaintiff Learning Corporation of America [LCA] has been entering into licensing agreements with BOCES for the purchase of 16-millimeter prints of educational films. In 1975, its revenues from BOCES reached a peak of $12,676.25, but declined to $1,703.75 by 1977. Some of the films on which LCA's infringement claim is based have been the subject of licensing agreements. Neither of the other two plaintiffs has at any time entered into licensing agreements with BOCES.

BOCES was created under § 1958 of the New York Education Law for the purpose of providing educational services and specialized instruction on a cooperative basis to the school districts within its geographic district. The Erie County BOCES services twenty-one school districts, including over one hundred separate schools. The focus of this lawsuit is one of BOCES services, its practice of videotaping educational programs from television broadcasts and distributing the tapes to the schools for delayed viewing in the classrooms.

BOCES admits that it has been videotaping television programs of educational value since 1966. Since 1968, it has been openly distributing catalogs to the teachers within the twenty-one school districts which describe the available programs and provide ordering instructions. Each of the educational films involved in this lawsuit has been listed in one of BOCES' catalogs as available to the schools.

When a program of educational value is broadcast on television, BOCES makes a master videotape of the entire film. The vast majority of films it tapes are broadcast by the local public broadcasting channel, WNED–17, but some also are broadcast by commercial stations. The catalog describes the programs and provides that if a teacher wants to order a copy, the school district must supply BOCES with sufficient blank videotape and allow two weeks for processing.

When a school files a written request for a videotape, BOCES copies the master onto the blank tape and delivers the copy to the requesting school. BOCES holds the master in its videotape library for varying periods of time before erasure. The copies are viewed by the students in the classroom, and in most instances then are returned to BOCES for erasure and reuse in videotaping other programs. However, BOCES does not require the schools to return the tapes. A few of the school districts keep the copies for their own videotape libraries. BOCES also does not monitor the use of the tapes by the schools, but presumes they are used solely for educational purposes. Copies are distributed only to the schools within its twenty-one school districts and then only upon written request. Copies are supplied to the schools at cost, and no admission is charged to the students.

With the exception of the 1974–75 school year, BOCES has records of the number of copies made of each particular television program. These records show that the volume of copying is substantial. During the 1976–77 school year, for instance, BOCES duplicated approximately ten thousand videotapes. BOCES has not kept records of the number of times a copy has been displayed in the classroom or the ultimate disposition of the tapes.

According to the defendants' affidavits, this program is a significant component of the instructional support services provided by BOCES, and is relied upon by the teachers in planning their school curricula. Since many of the programs are televised when classes are not in session or at times that do not coincide with coverage of the subject in a particular course of study, it is claimed that the students cannot view these programs unless videotapes are available. In order to provide this service, BOCES has invested a considerable amount of money in videotape equipment, which has an estimated replacement cost of one-half million dollars. BOCES has between five and eight full-time employees working to provide the service. The defendants claim that if the program is discontinued, public education would be greatly disrupted.

All three of the plaintiffs have been aware that educational institutions were videotaping their copyrighted television programs for some time. Time-Life has had knowledge of this practice since at least 1972, and LCA and Encyclopaedia Britannica have known since 1973. The Association of Media Producers, a trade organization to which all three of the plaintiffs belong, has been negotiating with the National School Board Association and other representatives of educational institutions in an attempt to define what constitutes fair use in the area of videotaping educational programs. These negotiations are still in progress, and no compromise has yet been reached.

BOCES' practices came to LCA's attention approximately in December 1976, when it received a copy of the BOCES videotape catalog. The catalog was thereafter supplied to the other two plaintiffs, and this action was commenced.

The plaintiffs' theory of infringement is straightforward. As the copyright owners of the films in question, they claim that they have the exclusive rights under federal copyright law to copy and perform the films. These exclusive rights were infringed by BOCES each time it videotaped one of the films off the air without permission and again each time it distributed a copy of a tape to a requesting school for performance in the classroom. They argue that in copyright infringement actions, irreparable harm is presumed once a prima facie case of infringement is established, and that therefore they are entitled to preliminary injunctive relief.

BOCES admits that it has videotaped the plaintiffs' copyrighted films without paying license fees or obtaining permission, but opposes the motion on three grounds. First, it raises the fair use doctrine as a defense and argues that noncommercial videotaping of television programs off the air for purposes of delayed viewing in the classroom is not a copyright infringement. Second, BOCES argues that the plaintiffs are barred by the doctrines of laches and estoppel from obtaining preliminary relief. Finally, it contends that any presumption of irreparable harm is rebutted by the existence of a clear measure of damages provided by the plaintiffs' licensing agreements, coupled with BOCES' records of the number of copies it has produced. In the post-argument papers, BOCES makes the additional claim that most of the television programs videotaped by BOCES were purchased by the local educational channel, WNED–TV, with state funds, and that these appropriations were made to WNED for the purpose of providing instructional broadcasts for the public schools at no cost to the schools. BOCES argues that the plaintiffs are seeking to force the state to pay twice for the use of their films and that the appropriations would not have been made if the instructional programs could not be utilized by the schools through videotaping. Although BOCES voluntarily stopped distributing tapes to the schools when the suit was commenced, it claims that this has caused a substantial hardship to the educational institutions served and wishes to reinstate its program.

■ As a general rule, a motion for preliminary relief should be granted only upon a clear showing of either probable success on the merits and possible irreparable injury or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping in the plaintiff's favor. *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973). In copyright infringement cases, however, the standard is less rigorous. It is well established that "[a] copyright holder in the ordinary case may be presumed to suffer irreparable harm when his right to the exclusive use of the copyrighted material is invaded." *American Metropolitan Enterprises v. Warner Brothers Records*, 389 F.2d 903, 905 (2d Cir. 1968). Because injury normally can be presumed, the plaintiff in a copyright case is entitled to a preliminary injunction even without a detailed showing of irreparable harm if the plaintiff demonstrates probable success on the merits or a prima facie case of infringement. *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 588 F.2d 91, 94 (2d Cir.1977), cert. denied, —— U.S. ——, 98 S.Ct. 730, 54 L.Ed.2d —— (1978); *see also Robert Stigwood Group, Ltd. v. Sperber*, 457 F.2d 50, 55 (2d Cir. 1972); *Uneeda Doll Co. v. Goldfarb Novelty Co.*, 373 F.2d 851, 852 n.1 (2d Cir. 1967); *Rushton v. Vitale*, 218 F.2d 434, 436 (2d Cir.1955) (Clark, J.).

## I.

Turning first to the question of irreparable injury, the plaintiffs claim that BOCES' videotaping is depriving them of licensing fees and is irreparably impairing their market for educational films. They point out that BOCES could readily avoid any disruption in its educational services pending a final decision in this case by entering into licensing agreements with the plaintiffs for the copying and performance of their copyrighted films. They contend that these licenses would provide a ready measure of damages, payable out of the $10,000 bond should BOCES ultimately prevail.

BOCES contends that the presumption of irreparable harm in copyright infringement cases can be rebutted by showing that monetary damages would provide full compensation for any infringement. They claim that the plaintiffs' licensing agreements, taken in conjunction with BOCES' records of the number of videotapes being made, provide a clear measure of damages, and that therefore preliminary relief is inappropriate.

■ I find that the plaintiffs' showing of irreparable harm is sufficiently detailed to meet the standard enunciated in *Wain-*

*wright.* The plaintiffs allege that BOCES' practices threaten to destroy or substantially impair their market for educational films. This claim, if true, encompasses injury beyond lost licensing fees, which cannot readily be reduced to monetary terms. Moreover, BOCES does not keep records of the number of times each film is displayed in the schools, and it does not guarantee return of the videotapes. Absent such records and guarantees, the licensing agreements would not provide a clear measure of damages caused by distributing copies of the films to the schools.

## II.

The question of probable success on the merits poses a more troublesome issue. Educational institutions have been videotaping television broadcasts for strictly educational purposes for some time. The legality of such copying has never been determined, either by the courts [1] or by the legislature. The problem of accommodating the competing interests of both educators and film producers raises major policy questions which the legislature is better equipped to resolve. However, Congress has not as yet provided a legislative solution to the problem, but has left the issue to the courts.[2]

I assume for purposes of this motion that the plaintiffs are the copyright owners of the films providing the basis for this lawsuit,[3] and that BOCES has videotaped and distributed copies of these films without the plaintiffs' permission, either by license agreements or otherwise.[4] This squarely raises the issue of infringement.

---

1. *Walt Disney Productions v. Alaska Television Network*, 310 F.Supp. 1073 (W.D.Wash.1969), is not in point. The defendant in that case was engaged in commercial videotaping for profit and no question of fair use was raised.

2. The Copyright Revision Act of 1976, Act of Oct. 19, 1976, *Pub.L.No.* 94–553, 90 Stat. 2541, codified in 17 U.S.C. §§ 101–810, makes extensive changes in the copyright law, many of which were designed to address issues raised by rapidly changing technology. Several isolated problems regarding the use of copyrighted works by educators are resolved by the new legislation. *See, e. g.,* 17 U.S.C. § 110(1) (allowing teachers engaged in "face-to-face teaching activities" to use copyrighted works under certain well-defined circumstances); *id.* § 504(c)(2) (exempting teachers acting in good faith and with the reasonable belief that their use was fair from statutory liability for infringement). For a more detailed discussion of these provisions, *see* Comment, "Education and the Copyright Law," 46 Ford. L.Rev. 91 (1977). The Act also mentions videotaping in several limited contexts. *See, e.g., id.* § 108(f)(3) (allowing libraries to videotape newscasts for distribution to educators and researchers); *id.* § 118(d)(3) (allowing nonprofit institutions to videotape certain noncommercial television broadcasts for use in face-to-face-teaching activities within seven days of the broadcast).

   However, the Act does not address the question of whether off-the-air videotaping of copyrighted motion pictures for classroom use is an infringement. The legislative history clearly demonstrates Congress' intent to leave the problem to the courts pending further negotiations between the film industry and educators aimed at developing guidelines to protect the interests of both groups. The House Report, urging the interest groups to continue their discussions, states:

   > The problem of off-the-air taping for non-profit classroom use of copyrighted audiovisual works incorporated in radio and television broadcasts has proved to be difficult to resolve. The Committee believes that the fair use doctrine has some limited application in this area, but it appears that the development of detailed guidelines will require a more thorough exploration than has so far been possible of the needs and problems of a number of different interests affected, and of the various legal problems presented. Nothing in section 107 or elsewhere in the bill is intended to change or prejudge the law on the point.

   *H.R.Rep. No.* 94–1476, 94th Cong., 2d Sess. 71–72 (1976), *reprinted in* [1976] U.S. Code Cong. & Admin. News pp. 5659, 5685.

3. When the complaint was filed, the case concerned nineteen copyrighted films owned by the plaintiffs. Since that time, preliminary discovery has uncovered additional films owned by the plaintiffs and copied by the defendant. At this stage, BOCES is not contesting the plaintiffs' ownership of the copyrights. As additional films are added to the complaint, however, BOCES is entitled to investigate plaintiffs' ownership of particular films and object where appropriate.

4. As to LCA, some question of permission may exist. Some of the films providing the basis of this lawsuit were at one time the subject of licensing agreements between LCA and BOCES. In addition, as pointed out in the defendants' Brief in Opposition to Motion for Preliminary Injunction at 36–37, LCA agreed to allow

Section 1 of the Copyright Act of 1909 declares that a copyright owner shall have the exclusive rights to copy the copyrighted work and to exhibit or perform it publicly. Infringement of these rights entitles the copyright owner to injunctive and monetary relief.[5] Substantially the same general provisions were reenacted by Congress in the Copyright Revision Act of 1976,[6] which applies to any alleged infringements occurring on or after January 1, 1978. Act of October 19, 1976, *Pub.L.No.* 94–553, Transitional and Supplementary Provisions, § 102, 90 Stat. 2598.

■ Viewed solely in reference to the copyright law, BOCES' videotaping activities would seem to constitute a blatant violation of the plaintiffs' exclusive rights to copy and perform their films. However, the statutory language is qualified by the judicial doctrine of "fair use." Although the doctrine is a defense to claims of copyright infringement, *Nimmer on Copyright* § 145, its application nevertheless must be considered in determining the existence of a prima facie case for purposes of preliminary relief. *Wainwright, supra* at 94.

■ The fair use doctrine was developed by the courts as a means of balancing the public's interest in the development of arts, science, and history with the copyright owner's exclusive rights. It has been defined as "a privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner . . .." *Rosemont Enterprises v. Random House,* 366 F.2d 303, 306 (2d Cir. 1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967), quoting Ball, *Copyright and Literary Property* 260 (1944).

■ Although the line between infringement and fair use of copyrighted material depends on the facts of each case, *Meeropol v. Nizer,* 560 F.2d 1061, 1068 (2d Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978), the courts have given primary consideration to four factors in determining whether a given use is fair. *Id.* Congress has codified these four factors in § 107 of the Copyright Revision Act of 1976. Section 107 is intended to restate and not to change existing doctrine of fair use.[7] It reads in part as follows:

> In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

videotaping off the air by schools which subscribed to educational television for seven-day periods after the program was broadcast, and some question arises as to whether BOCES' practices fall within this express permission. These issues should be resolved at trial.

5. Derived from Act of Mar. 4, 1909, ch. 320, §§ 1, 25, 64, 35 Stat. 1075, 1081, 1088, and previously codified in 17 U.S.C. §§ 1(a), 1(d), 101.

6. Now codified in 17 U.S.C. §§ 106, 502–05.

7. *H.R.Rep. No.* 94–1476, *supra* n.2, at 65–66. With the exception of taping newscasts under § 108, the Copyright Revision Act does not extend the right to videotape copyrighted films beyond that permitted by existing seven-day taping rights. The plaintiffs argue that this demonstrates Congress' intent not to exempt educational uses of copyrighted films from the class of infringing uses. The legislative history, however, makes clear that the statutory exemptions were intended to supplement rather than supersede the doctrine of fair use. *Id.*

at 66, 72; *H.R.Rep. No.* 90–83, 90th Cong., 1st Sess. 37 (1967). Therefore, one cannot infer that a use is prohibited merely because it was not exempted by the statute.

The plaintiffs also quote several passages from the legislative history which appear to support their argument that BOCES' activities cannot be considered a fair use under any circumstances. *H.R.Rep. No.* 94–1476, *supra* n.2, at 72–73; *S.Rep. No.* 94–473, 94th Cong., 2d Sess. 65–66 (1976). The limited scope of the fair use guidelines adopted for classroom reproduction of books, periodicals, and music also support the plaintiffs' position. *See H.R. Rep. No.* 94–1476, *supra* n.2, at 67–71. On the other hand, Congress carefully disclaimed any intent to influence the present judicial doctrine of fair use as it relates to off-the-air taping for noncommercial classroom use, and made it clear that it was leaving open the question of the legality of such a use. *Id.* at 72. In light of this background, these arguments of the plaintiffs are inconclusive.

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

Despite this guidance the application of the fair use doctrine has been characterized as "the most troublesome in the whole law of copyright." *Dellar v. Samuel Goldwyn, Inc.*, 104 F.2d 661, 662 (2d Cir. 1939).

BOCES argues that videotaping educational programs off the air for delayed viewing by students constitutes a fair use of plaintiffs' films and that therefore the plaintiffs have not shown probable success on the merits in their application for preliminary relief. In support of its position, BOCES relies on *Williams & Wilkins Co. v. United States*, 487 F.2d 1345, 203 Ct.Cl. 74 (1973), *aff'd by an equally divided court*, 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1975), the leading case in the application of the doctrine to noncommercial copying. Due to the difficulty and complexity of the issues raised by BOCES' defense, a detailed examination of *Williams & Wilkins* is in order.

In *Williams & Wilkins*, a major publisher of medical journals sued a federal medical research organization and its library for copyright infringement of four of its journals. The claim was based on the defendants' admitted practice of photocopying articles from medical journals at the request of medical researchers and practitioners who used the articles for professional purposes. The defendants also supplied copies of journal articles to other libraries and research institutions as part of an inter-library loan program. The copying for individual requesters was massive in scope, involving ninety-three thousand articles in the year 1970 alone and requiring four full-time employees to fill the requests. The copying for the inter-library loan program also was substantial. However, the defendants normally restricted copying on individual requests to a single copy of a single article and to articles of less than fifty pages. Requests from other institutions were filled in most cases only if the article was at least five years old or not published in one of approximately one hundred widely available medical journals. An excessive number of requests from a given individual or institution would not be honored. In all cases, the requests were for professional, nonprofit purposes, but no monitoring took place of the use to which the copies were put, and copies were not returned to the library.

After an extensive trial, the trial judge found that the plaintiff's copyrights had been infringed. A sharply divided panel of the Court of Claims reversed, and an equally divided Supreme Court affirmed.

Judge Davis, writing for the four-judge majority on the Court of Claims, applied the four factors described above, and concluded that the defendants' copying was a fair use. The court's conclusion was based on three primary considerations:

First, plaintiff has not in our view shown, and there is inadequate reason to believe, that it is being or will be harmed substantially by these specific practices of NIH and NLM; second, we are convinced that medicine and medical research will be injured by holding these particular practices to be an infringement; and, third, since the problem of accommodating the interests of science with those of the publishers (and authors) calls fundamentally for legislative solution or guidance, which has not yet been given, we should not, during the period before congressional action is forthcoming, place such a risk of harm upon science and medicine.

*Id.* at 1354.[8]

The analysis used by the Court of Claims in *Williams & Wilkins* is instructive in com-

---

**8.** Congress responded to the court's call for a legislative solution in § 108 of the Copyright Revision Act, which authorizes the type of photocopying engaged in by the defendants. In enacting § 108, Congress stated that it did not intend to "take away any rights existing under

paring the two cases and in deciding the issues presented here. The purpose and character of the use, which is the first factor considered by the courts in determining whether a given use is fair, is similar in both cases. Both sets of defendants have been providing services on a strictly noncommercial basis to a limited class of requesters for the purpose of promoting two traditionally favored areas of endeavor: science and education. Although the plaintiffs argue that a distinction should be drawn between the two uses because scientific research is more creative than education, there is no support for this distinction in the case law. As to the first factor, the parallels between the two cases are strong.

But as to the factors of the substantiality of the copying and the effect of the copying on the copyright owner's market, the two cases are distinguishable. In *Williams & Wilkins*, the requests normally were limited to single articles of fifty pages or less. In this case, the entire copyrighted film is being reproduced. Although the medical library did copy entire articles, each of which could be considered a discreet whole, there is nevertheless a significant difference between copying an article out of a medical journal and reproducing an entire copyrighted work. In the latter case, the potential impact on the copyright owner's market is much greater because the reproduction is interchangeable with the original. The substantiality and extent of BOCES' copying clearly exceeds that of the medical libraries.

█ As to the impact on the copyright owner's market, the court must assume for purposes of this motion that BOCES' practices have had or will have a substantial effect on the plaintiffs. In *Williams & Wilkins*, in contrast, the court found the effect on the market to be minimal. *Id.* at 1357–59. This difference in economic impact between the two cases arises out of their different procedural postures. The *Williams & Wilkins* decision followed a full trial on the merits. After the plaintiff had an opportunity to demonstrate the effect of the photocopying on the market for medical journals, the court concluded that it had failed to show that it would be substantially harmed by the defendants' practices. Here, in contrast, the case arises on the plaintiffs' motion for preliminary relief. The question of the effect of BOCES' videotaping on the plaintiffs' market for educational films has not yet been tried. Although BOCES has made a noteworthy attempt to show through preliminary discovery that the plaintiffs have not suffered any economic loss or impairment of their market,[9] the plaintiffs' affidavits contain allegations to the contrary.[10] These allegations raise substantial questions of fact, which can be decided only after a full trial record has been developed. Since the burden of establishing fair use is on the defendant and since the plaintiff in a copyright case is presumed to suffer irreparable injury, the court must assume for purposes of this motion that the plaintiffs are capable of proving their allegations.[11]

A final distinguishing factor between this case and *Williams & Wilkins* is BOCES' ability to avoid disruption of classroom

---

the fair use doctrine." *H.R.Rep. No.* 94–1476, *supra* n.2, at 74; U.S. Code Cong. & Admin. News 1976, p. 5688. The court's analysis in *Williams & Wilkins* therefore remains valid today as to questions left open by the new Act.

9. *See* Supplemental Memorandum in Opposition to Plaintiffs' Request for a Preliminary Injunction at 2, and affidavits of Carl B. Kustell dated December 16, 1977 and December 23, 1977.

10. Affidavits of Ivan R. Bender, dated September 28, 1977; David M. Davidsen, dated Sep-

tember 1, 1977; Richard W. Schilling, dated October 5, 1977; John J. Urtis, dated September 30, 1977.

11. This is not to say that BOCES, like the defendants in *Williams & Wilkins*, will not be able to prove the absence of economic harm at trial, which would require a reassessment of the fair use defense. For purposes of determining whether the plaintiffs have demonstrated probable success on the merits, however, the issue of economic loss must be found in favor of the plaintiffs.

services by entering into licensing agreements with the plaintiffs pending resolution of this case. One of the three considerations cited as controlling by the court in *Williams & Wilkins* was the injury to medical research that would result if the court found copyright infringement. *Id.* at 1360. Here, any injury can be avoided pending a final decision, and the plaintiffs' bond provides a ready source of recovery should BOCES ultimately prevail.

The scope of BOCES' activities is difficult to reconcile with its claim of fair use. This case does not involve an isolated instance of a teacher copying copyrighted material for classroom use but concerns a highly organized and systematic program for reproducing videotapes on a massive scale. BOCES has acquired videotape equipment worth one-half million dollars, uses five to eight full-time personnel to carry out its program, and makes as many as ten thousand tapes per year. For the last twelve years, these tapes have been distributed throughout Erie County to over one hundred separate schools.

■ Considering all of these factors, I find that the plaintiffs have established a prima facie case entitling them to preliminary relief. As BOCES points out, the applicability of the defense of fair use raises numerous questions of fact which cannot be resolved without a full trial on the merits. At this stage in the proceedings, I find that the substantiality of the copying and the possible impact on the market for education films tip the balance in favor of the plaintiffs, outweighing BOCES' noncommercial, educational purpose in copying the films.

In its post-argument papers, BOCES raises the additional claim that most of the television programs which it videotaped were purchased by WNED–TV with state funds, and that these appropriations were made to WNED for the purpose of providing instructional broadcasts for the public schools at no cost to the schools. BOCES argues that the plaintiffs are seeking to force the state to pay twice for the use of their films and that the appropriations would not have been made if the instructional programs could not be utilized by the schools through videotaping. At this time, the record does not contain sufficient information pertaining to this claim to defeat the plaintiffs' application for preliminary relief. This possible defense should be developed at trial.

### III.

The final point to be addressed is BOCES' contention that the plaintiffs' laches in bringing this motion bars their claim for preliminary relief.

■ Although the plaintiffs may have been aware for some time of the practice of some educational institutions of videotaping their copyrighted films, on the present record it appears that the plaintiffs had no knowledge of BOCES' practices until December of 1976 and therefore could not have sued BOCES until that time. Their delay in raising the infringement question in the courts, caused at least in part by their attempts to reach an out-of-court compromise solution to a difficult and complex problem, should be commended rather than condemned.

■ As to the ten-month delay between the time that the plaintiffs received BOCES' catalogs and the time that they filed a complaint against BOCES, I recognize that the organization and planning of a lawsuit involving multiple plaintiffs and substantial legal claims require time. On the present record, I am not willing to find that the ten-month delay was so excessive as to preclude preliminary relief.

The cases cited by the defendant are readily distinguishable from this case because they involved substantial questions of fact as to whether the defendant had in fact copied the plaintiff's copyrighted material. *Slifka v. Citation Fabrics Corp.*, 329 F.Supp. 1392 (S.D.N.Y.1971); *Gianni Cere-*

*da Fabrics, Inc. v. Bazaar Fabrics, Inc.*, 335 F.Supp. 278 (S.D.N.Y.1971); *Klauber Brothers Inc. v. Lady Marlene Brassiere Corp.*, 285 F.Supp. 806 (S.D.N.Y.1968). These disputes decreased the likelihood that the plaintiffs would succeed on the merits, rendering preliminary relief less appropriate than in cases such as this where the copying is admitted.

## IV.

The plaintiffs have established their entitlement to preliminary relief. Accordingly, I direct that BOCES be enjoined from videotaping the plaintiffs' educational films or programs off the public airwaves. If this order unduly disrupts educational plans, BOCES can obtain licenses from the plaintiffs for use of the films. As to films which have already been videotaped and are incorporated into the curricula of the BOCES' school districts, however, I find that the public interest would be served if BOCES is allowed to continue distributing such tapes to the schools. The interests of the plaintiffs will be adequately protected if BOCES, in cooperation with the school districts, implements a plan to monitor the use of the tapes in the schools and to require their return and erasure within a specified time period.

The parties are directed to meet with the court on March 3, 1978 at 9:00 a. m. to frame an order complying with this decision.

So ordered.