CLARK EQUIPMENT COMPANY, a Delaware corporation, Plaintiff,

v.

HARLAN CORPORATION, a Kansas corporation, and James H. Kaplan, an individual, Defendants.

Civ. A. No. 82–2049.

United States District Court, D. Kansas.

May 24, 1982.

Thomas Ruzicka, Gardner, Davis & Kreamer, Olathe, Kan., Paul R. Lamoree, Watson, Ess, Marshall & Enggas, D. A. N. Chase, Kansas City, Mo., Mack L. Thomas, Buchanan, Mich., for plaintiff.

William E. Scott, Scott & Daily, J. Nick Badgerow, McAnany, Van Cleave & Phillips, Kansas City, Kan., Jerome T. Wolf, Curtis E. Woods, Spencer, Fane, Britt & Browne, Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the Court on plaintiff's application for a preliminary injunc-

tion. On February 12, 1982, this Court entered a temporary restraining order and issued a writ of seizure and impoundment directing the United States Marshal for the District of Kansas to seize from the defendants certain articles which allegedly infringed upon copyrights held by plaintiff. On April 22 and 23, 1982, the Court heard oral argument on plaintiff's motion for a preliminary injunction. This case is concerned with the Clark Micro-Master Parts System, an allegedly unpublished work authored by plaintiff and protected by common-law copyright. The Clark Micro-Master Parts System is a computer program and data base which has never been printed out on paper since the mid-1970s, but which has been reproduced directly onto a microfilm medium and distributed to Clark forklift truck dealers. According to plaintiff, this microfilm system allows a Clark dealer to find within seven seconds a part for any forklift manufactured by Clark by using a fast microfilm reader and Clark's cross-indexing system. Plaintiff alleges that it has never published the Clark Micro-Master Parts System, but rather has distributed it only to authorized Clark dealers in an explicitly confidential way. Neither of the defendants in this case is an authorized dealer; nevertheless, it is alleged defendants have been copying the Clark Micro-Master Parts System microfilm and distributing these copies to other persons in some forty-four countries on at least four continents.

In determining whether a preliminary injunction should issue, the Court makes the following findings of fact and conclusions of law.

## I

### FINDINGS OF FACT

Plaintiff Clark Equipment Company is the largest manufacturer of industrial lift trucks in the United States. Plaintiff manufactures certain parts used in the assembly and manufacture of its lift trucks, and purchases various other parts from third-party manufacturers. Similarly, plaintiff fabricates its own replacement parts and purchases various other replacement parts from third-party manufacturers. Plaintiff distributes replacement parts for its lift trucks principally through a network of authorized dealers throughout the world.

Defendant Harlan Corporation is in the principal business of fabricating and distributing replacement parts for Clark lift trucks and the rebuilding of used Clark lift trucks and parts assemblies used in Clark trucks. Defendant is headquartered in Kansas City, Kansas, and has facilities in Los Angeles, California, and Fort Wayne, Indiana. Defendant has dealers throughout the world. Defendant James H. Kaplan is Harlan's president.

Defendant Harlan designs and fabricates approximately five thousand parts for use in Clark lift trucks, and also wholesales and retails replacement parts manufactured by Clark and others for use on Clark trucks. Defendants acquire Clark replacement parts from various sources, including plaintiff's own central parts division based in Chicago, Illinois, Clark dealers and government surplus sales. Defendants also sell parts to Clark dealers when a Clark dealer needs a particular part and can obtain it more quickly from defendants than from Clark's central parts division in Chicago.

Prior to 1962, plaintiff made available to its customers, and to the public generally, customer parts manuals for each model of lift truck it manufactured. Included in these manuals were diagrams of assemblies making up the particular model and an index which matched each part with a part number assigned to it by plaintiff. Defendants acquired these manuals from various sources, including plaintiff itself and various Clark authorized dealers.

Commencing in the early 1960s, plaintiff devised a new system to identify component parts of its lift trucks. Plaintiff began to assign "key numbers" to generic types of parts and assemblies of parts used in its trucks. For example, the transmission in every lift truck manufactured by plaintiff is identified by the key number 06.200. At the same time, Clark created and intro-

duced three new works which embodied this key-number system: (1) plaintiff began issuing customer parts manuals for each model lift truck which no longer identified parts by part number, but rather identified parts only by key number; (2) the Master Parts Book; and (3) the Master Assembly List.

From 1962 to the present, plaintiff has distributed the key-number-only customer parts manuals to its customers, but has not generally made available to customers the Master Parts Book and the Master Assembly List. Each page of a customer parts manual contains a diagram of an assembly of parts within each component part in what might be called an exploded view, and identifies each component part with its generic key number.

The Master Assembly List basically combines each and every customer parts manual. Each page contains a drawing of an assembly of parts with each component part matched with its own generic key number. Below the diagram the component parts of the assembly are listed by key number, a word description or name of the part, and the part number.

The Master Parts Book ties the key number of a given major assembly, for example, a transmission, to the part number for that assembly in a particular truck. The truck is identified by its serial number. The Master Parts Book indexes part numbers to key numbers for large major assemblies of each truck. To determine the part number for a large major assembly of a truck, such as a transmission, one must examine the customer parts manual to determine the key number of the major assembly, and examine the truck itself to determine the truck's serial number. Then one consults the Master Parts Book for the appropriate part number. To determine what the part numbers are for smaller, individual component parts of an assembly, such as one gear of a transmission, the Master Assembly List must be consulted.

In the early years following the establishment of the key-number system, from approximately 1962 to approximately 1965, plaintiff published customer parts manuals which disclosed both key numbers and parts numbers for trucks manufactured in that period. After 1965, plaintiff only identified parts in customer parts manuals by key numbers.

Before plaintiff devised its key-number system, a customer merely consulted his customer parts manual for his particular truck to determine the part number for the part he wanted. He could then buy that part from any seller, since both he and the seller were provided with the part number. After the creation of the key-number classification system, plaintiff did not generally make available the part number information to the purchasers of its trucks. To determine a part number, a customer or a seller was required to consult the Master Parts Book and the Master Assembly List. From 1962 and thereafter, the Master Parts Book and the Master Assembly List were distributed to Clark dealers in paper form. A customer who wanted to determine a given part number presumably had to consult a Clark dealer to determine that information.

From 1962 and thereafter, the Master Parts Book and the Master Assembly List, in printed form, were distributed to Clark dealers without any notice regarding duplication or release of the information to persons other than customers. In approximately 1970, plaintiff began placing notices of confidentiality on new and revised individual pages of the Master Parts Book. Plaintiff did not make any effort to advise its dealers that the pages of the Master Parts Book in existence from 1962 to 1970, which had not been revised, were in any way confidential and could not be duplicated. With respect to the Master Assembly List, at no time between 1962 and 1982 did plaintiff ever place on any assembly list, or any of its pages or covers, any proprietary, confidentiality or copyright notice.

Beginning in approximately 1962, plaintiff only required its dealers to sign a receipt to "acknowledge receipt (of the) Master Parts Book, and agree to keep same up to date with revised sheets as received."

This receipt set forth no notice of confidentiality, copyright or restriction on reproduction or release to others. No such receipt was ever required for the Master Assembly List. In 1967, plaintiff began requesting its dealers to sign an acknowledgment of receipt of a Master Parts Book. These acknowledgments read:

"Receipt is hereby acknowledged by the undersigned of Copy No. _____ of Master Parts Book, which is and will remain the property of Clark Equipment Company and which will be returned to Clark Equipment Company on demand."

Nowhere in this acknowledgment did Clark give any notice of confidentiality, copyright or restriction of duplication or release to others. No such request for a signed acknowledgment of receipt was made by plaintiff with respect to the Master Assembly List.

In approximately 1966, defendants obtained a Master Parts Book and Master Assembly List from an authorized Clark dealer. No notice appeared on them, and neither plaintiff nor the Clark dealer advised or notified defendants of any confidentiality or copyright restrictions. Into the early 1970s, persons other than authorized Clark dealers or customers legitimately could acquire nearly a full set of the Master Parts Book and a complete Master Assembly List in printed form without any notice of proprietary rights, confidentiality or copyright.

In February, 1973, plaintiff placed the Master Parts Book and Master Assembly List on microfilm to facilitate its use. A complete microfilm set consists of approximately thirty-six cartridges, eight cartridges of the Master Parts Book and twenty-one cartridges of the Master Assembly List. Also contained within the microfilm sets are the Technical Information Bulletins, the Machine Record Card Supplements, the Master Parts Book Late Model Supplements, the Repair Kits, Hose and Standards Conversions, and the Master Assembly List New and Revised Assemblies. On May 30, 1973, plaintiff notified all of its dealers that they were required to sign "a custody receipt covering your set of microfilm cartridges for the MASTER PARTS BOOK and MASTER ASSEMBLY LIST microfilm shipped to you on 16 February 1973." The receipt stated:

"Receipt is hereby acknowledged by the undersigned of Copy No. _____ of MASTER PARTS AND MASTER ASSEMBLY MICROFILM, which is and will remain the property of Clark Equipment Company and which will be returned to Clark Equipment Company on demand."

This receipt did not notify the dealers that the microfilm was confidential or that a copyright was held by Clark Equipment Company, and did not in any way restrict or prohibit duplication or release to others the information contained on the microfilm.

Plaintiff supplied full sets of microfilm to six of its largest customers without any notice of confidentiality or agreement regarding reproduction or duplication. No custody receipts were obtained from these customers, although the dealers through whom the microfilm was supplied were required to execute custody receipts.

In May, 1975, plaintiff submitted confidentiality agreements to dealers for their signatures, but only with respect to the Master Parts Book on microfilm, and not with respect to the Master Assembly List. This marked the first time since its creation in 1962 in printed form that plaintiff required any confidentiality agreement regarding the Master Parts Book. In 1980, plaintiff required confidentiality agreements from the six major parts-stocking customers who had received complete sets of microfilm. By its terms, these confidentiality agreements pertained only to the Master Parts Book and did not include the Master Assembly List within its terms. Confidentiality and copyright notices were not placed on the Master Assembly List pages on microfilm until 1982.

From time to time, after institution of the key-number system in 1962, Clark's customers requested disclosure of parts numbers to enable them to identify and order parts. In response to these requests, plaintiff has provided customers, from 1962 to

the present, with paper copies of frames from the Master Assembly List for trucks a particular customer owned. Plaintiff received as many as one hundred requests per year for assembly lists, and would make copies of hundreds of assembly lists to send to a customer. These photocopied assembly lists virtually were given to any customer who asked for one; the only requirement was that the customer verify that it owned the truck for which it requested assembly lists. No notice of proprietary rights, confidentiality or copyright were placed on these copies or given to the customer in any form, nor was the customer required to sign any custody receipt or confidentiality agreement. Plaintiff keeps no records of which assembly lists have been copied and freely given out, and plaintiff has never demanded of its dealers to keep such records. Both parties agree there is no way of knowing which assembly lists, and how many copies of each, have been distributed, and to whom they have been distributed.

Sometime between 1974 and 1976, defendants acquired a copy of the 1973 microfilm through a business associate in West Germany, and acquired a later version of the microfilm sometime in 1979 from a competitor. Furthermore, various of defendants' customers have provided defendants with copies of assembly lists for trucks for which they have sought parts. Authorized Clark dealers have done the same for parts they desired defendants to supply them.

Until 1976, defendants purchased parts from plaintiff itself and plaintiff's dealers, and sold parts to Clark dealers when, for example, the dealer needed a part plaintiff no longer manufactured or which plaintiff could not immediately supply. Beginning in 1976, defendants' business with Clark dealers decreased and defendants began to compete directly with Clark dealers for retail sales. During this period, defendants established their own dealer network. Defendants copied the Clark parts information in their possession and supplied it to their dealers at nominal or no cost in order to enable them to compete with Clark dealers. The copies were made at a reproduction facility in the Kansas City area not associated with either defendants or plaintiff. The price charged for the copies was the cost of reproduction and handling. Defendants did not make a profit on the sale of microfilm copies to their dealers.

In 1980, plaintiff obtained a certificate of copyright registration for the Master Parts Book. In that registration, plaintiff represented that the Master Parts Book was created in 1980. Plaintiff did not designate the Master Parts Book as a compilation of pre-existing materials or as a derivative work. In 1981, plaintiff obtained a certificate of copyright for the Master Assembly List. In this registration, plaintiff represented that the Master Assembly List was created in 1981. Plaintiff described the Master Assembly List as a "compilation of existing, revised and supplemental data, text and illustrations." Both the registration for the Master Parts Book and the registration for the Master Assembly List state that no registration for an earlier version of those works had been made in the copyright office.

Defendants were not shown to have ever possessed, used or copied microfilm bearing a date after 1979. Defendants were not shown to have possessed, used or copied the microfilm sets registered by Clark, that is, the 1980 version of the Master Parts Book and the 1981 version of the Master Assembly List. Plaintiff has not registered with the copyright office any of the materials which defendants had in their possession at any time.

Plaintiff could have known since 1975 that defendants had copies of the microfilm, because defendants' advertising material since 1975 has contained part numbers and line drawings which could only have come from the Clark Master Assembly List. Furthermore, in early 1979, copies of plaintiff's microfilm were observed by plaintiff's parts sales manager, Richard Cialdella, on defendants' premises laying next to a microfilm reader. Mr. Cialdella made his observation while touring defendants' facility in Kansas City; two of plaintiff's vice-presidents were also present during the tour.

On their journey back to Chicago, Mr. Cialdella advised both vice-presidents of his observation, but no action was taken.

In February, 1982, three years after plaintiff's employees observed the microfilm on defendants' premises, plaintiff obtained an *ex parte* seizure and impoundment order and a temporary restraining order from this Court. During the three years which elapsed between the time plaintiff's employees observed the tapes and the *ex parte* remedy granted by this Court, defendants represent that they have invested $5.5 Million Dollars in automation of parts manufacture, including $2 Million Dollars in the purchase of manufacturing machinery. Defendants represent that the seizure of the microfilm pursuant to the Court's impoundment and restraining order costs defendants approximately $30 Thousand Dollars per month in lost sales.

## II

## DISCUSSION AND CONCLUSIONS OF LAW

In determining whether to grant a motion for preliminary injunction, courts in this district have traditionally considered the four factors set forth in Wright & Miller's FEDERAL PRACTICE AND PROCEDURE, *Civil*: § 2948, pp. 430–31:

"(1) the significance of the threat of irreparable harm to plaintiff if the injunction is not granted;

"(2) the state of the balance between this harm and the injury that granting the injunction would inflict on defendant;

"(3) the probability that plaintiff will succeed on the merits; and

"(4) the public interest."

Of course, a plaintiff must never forget that no one has an unlimited right to injunctive relief. The weighing of these four factors, and the process of determining whether injunctive relief should be granted, is a matter within the district judge's sound discretion. *Penn v. San Juan Hospital, Inc.,* 528 F.2d 1181, 1185 (10th Cir. 1975).

■ Preliminary injunctive relief is an extraordinary and drastic remedy. *Checker Motors Corp. v. Chrysler Corp.,* 405 F.2d 319, 323 (2nd Cir. 1969), *cert. denied* 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969); *Holiday Inns of America, Inc. v. B & B Corp.,* 409 F.2d 614, 618 (3rd Cir. 1969). The burden is on the plaintiff to persuade the Court that injunctive relief should be granted. *Automated Marketing Systems, Inc. v. Martin,* 467 F.2d 1181, 1183 (10th Cir. 1972); *Crowther v. Seaborg,* 415 F.2d 437, 439 (10th Cir. 1969). The Court will grant injunctive relief only upon a clear showing of entitlement to relief. *Penn v. San Juan Hospital, Inc., supra; Garlock, Inc. v. United Seal Inc.,* 404 F.2d 256 (6th Cir. 1968).

We shall address the four factors, beginning with the factors that deserve the greatest weight in the particular circumstances of this case.

A. *Probability of Success on the Merits*

■ The test for obtaining a preliminary injunction in a copyright case is slightly less rigorous than in most cases, because the plaintiff is entitled to preliminary injunction even without a detailed showing of irreparable harm if the plaintiff can show probable success on the merits or a *prima facie* case of infringement. *Encyclopaedia Britannica v. Crooks,* 447 F.Supp. 243 (W.D. N.Y.1978). Plaintiff herein has not made a clear showing that it probably will succeed on the merits.

At this preliminary stage, the Court concludes that plaintiff knew or should have known in early 1979 that defendants possessed copies of the Clark Equipment Company microfilm. This is clear from the deposition of Mr. Richard Cialdella. Also, defendants had been exhibiting line drawings in their advertising material which, barring only the most incredible coincidence, could only have come from Clark Equipment Company's Master Assembly List.

Plaintiff's inaction, under the circumstances of this case, should bar plaintiff from the extraordinary preliminary remedy it seeks. *Klauber Bros., Inc. v. Lady Marlene Brassiere Corp.,* 285 F.Supp. 806, 808

(S.D.N.Y.1968); *American Fabrics Co. v. Lace Art, Inc.*, 291 F.Supp. 589, 592 (S.D.N.Y.1968). Plaintiff argues that the simple fact that Mr. Cialdella observed unauthorized copies of the Clark Equipment Company microfilm on defendants' premises would not authorize a suit for copyright infringement, because it is no offense to buy and hold unauthorized copyrighted material. Plaintiff explains that its suit for infringement was not brought until it had solid grounds for concluding that defendants were duplicating the copyrighted works. This argument, however, ignores defendants' publication of line drawings which could only have come from the Master Assembly List in 1975, and continuing thereafter.

In attempting to establish the defense of estoppel or laches, defendants have made the required showing that plaintiff did not assert its rights diligently, and further that such lack of asserted diligence resulted in prejudice to defendants. *Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961); *Roberts v. Morton*, 549 F.2d 158, 163–64 (10th Cir. 1976). *See also, Lottie Joplin Thomas Trust v. Crown Publishers*, 592 F.2d 651, 655 (2nd Cir. 1978).

Apart from questions of delay, at this preliminary stage it appears there exists a substantial factual question as to whether plaintiff has lost its common-law copyrights by generally publishing the seven pleaded works, collectively called the Micro-Master Parts System. Plaintiff could have obtained a copyright on this material and published it with notice. In such an event, publication without notice results in forfeiture of the copyright. Plaintiff, however, relies on the doctrine of limited publication without notice. Plaintiff correctly asserts that a limited publication without notice does not divest the author of his common-law copyright.

The often-quoted formulation of the doctrine of limited publication is found in *White v. Kimmel*, 193 F.2d 744, 746–47 (9th Cir. 1952), *cert. denied* 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357 (1952), where that Court stated:

" ... a limited publication which communicates the contents of a manuscript to a definitely selected group and for a limited purpose, and without the right of diffusion, reproduction, distribution or sale, is considered a 'limited publication,' which does not result in loss of the author's common-law right to his manuscript; but that the circulation must be restricted both as to persons and purpose, or it cannot be called a private or limited publication. . . . "

It must be kept in mind that a limited publication is really in the eyes of the law no publication at law. *Data Cash Systems, Inc. v. JS & A Group, Inc.*, 628 F.2d 1038, 1043 (7th Cir. 1980). There is substantial evidence at this preliminary stage that plaintiff injected the Master Parts Book and the Master Assembly List into the public domain. First, plaintiff made both works generally available while in paper form, with no notice of copyright or confidentiality, and later provided complete sets of all works on microfilm to six of its customers without any restriction as to those customers' use, duplication or dissemination of that microfilm.

At common law, a creator of a work has a right to copy and profit from it, and can distribute it or show it to a limited class of persons for a limited purpose without losing that right. The right continues until the creator allows a general publication of his work to occur. *American Tobacco Co. v. Werckmeister*, 207 U.S. 284, 299, 28 S.Ct. 72, 77, 52 L.Ed. 208 (1907). A general publication occurs when a work is made available to members of the public at large without regard to whom they are or what they propose to do with it. *Burke v. National Broadcasting Co., Inc.*, 598 F.2d 688, 691 (1st Cir. 1979). A common-law copyright may be lost by a general publication or unrestricted sale of a single copy. *Bobbs-Merrill Co. v. Straus*, 147 F. 15, 19 (2nd Cir. 1906), *aff'd.* 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086 (1908).

Courts considering the question have held that the Copyright Act of 1976, 17 U.S.C. §§ 101–810, abolished the commonlaw copy-

right. *Russell v. Price*, 612 F.2d 1123 (9th Cir. 1979); *Burke v. National Broadcasting Co., Inc., supra; Birnbaum v. United States*, 588 F.2d 319 (2nd Cir. 1978); *Strout Realty, Inc. v. Country 22 Real Estate Corp.*, 493 F.Supp. 997 (W.D.Mo.1980). The 1976 act, however, does not affect rights with respect to causes of action that accrued before January 1, 1978. 17 U.S.C. § 301(a) and (b)(2).

■ The distinction between general and limited publications is one of degree, and does not depend upon the creator's intentions, but rather depends upon the creator's actions. *Burke v. National Broadcasting Co., Inc., supra*, at 692. Forfeiture of a common-law copyright is imposed upon a creator of a work as a consequence of his actions and his failure to comply with the prescribed formalities of copyright law. *National Comics Publications v. Fawcett Publications*, 191 F.2d 594, 598 (2nd Cir. 1951).

The substantial evidence in the record is that the publication of the full set of microfilm to plaintiff's six large customers was not a limited publication so as to preserve plaintiff's rights. Plaintiff argues that these six customers were supplied with microfilm through authorized dealers who were required to sign confidentiality agreements. However, these agreements did not purport to bind the customers who received copies of the microfilm, and there is no evidence that a single one of these customers ever saw, heard of or was required to sign such confidentiality agreements. From the evidence, the conclusion is inescapable that plaintiff published the microfilm by providing it to its customers without restriction.

With respect to the Master Assembly List, plaintiff's case is even weaker. Plaintiff failed to place any notice of copyright on any page of the Master Assembly List until 1982. The confidentiality notices which appeared on the Master Parts Book in 1970 did not constitute notice with respect to the Master Assembly List. Plaintiff apparently considered the Master Parts Book and the Master Assembly List as separate works; they were registered as such.

Furthermore, even after the Master Assembly List appeared only on microfilm, plaintiff indiscriminately supplied thousands of pages from the Master Assembly List to any customer who requested them. No agreements or restrictions were placed on those copied pages by plaintiff, and plaintiff does not maintain records concerning such copies or who requested them. The record clearly shows an unrestricted circulation by plaintiff among the general public of thousands of pages from the Master Assembly List for an indeterminate period of time. Into whose hands among the general public these pages have passed can only be guessed at by the Court. The unrestricted circulation of these copies may ultimately prove fatal to plaintiff's case. Therefore, no preliminary injunctive relief lies. *Stuff v. E. C. Publications, Inc.*, 342 F.2d 143, 145 (2nd Cir. 1965); *White v. Kimmell*, 193 F.2d 744, 748 (9th Cir. 1952).

Our ruling on the probability of success on the merits by no means should be read as an indication that plaintiff cannot prevail. We only hold that plaintiff has demonstrated no reasonable probability of success on the merits as is required to support issuance of a preliminary injunction. *Automated Marketing Systems, Inc. v. Martin*, 467 F.2d 1181, 1183 (10th Cir. 1972); *Crowther v. Seaborg*, 415 F.2d 437, 439 (10th Cir. 1969).

B. *Irreparable Harm*

■ We agree with plaintiff that a copyright holder in the ordinary case may be presumed to suffer irreparable harm when his right to the exclusive use of copyrighted material is invaded. *American Metropolitan Enterprises v. Warner Bros. Records*, 389 F.2d 903, 905 (2nd Cir. 1968). The plaintiff in a copyright case is entitled to preliminary injunction without a detailed showing of irreparable harm. *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91 (2nd Cir. 1977), *cert. denied* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). Therefore, the Court will presume an irreparable injury to plaintiff. This factor weighs in favor of preliminary relief.

## C. *The Balance of Harm*

It is one thing to presume that plaintiff will suffer irreparable injury; it is quite another to conclude, as plaintiff would have us do, that any damage plaintiff may incur while this litigation proceeds is of a different character or degree than it has experienced during the preceding seven years it has known or should have known defendants were using its parts-finding system.

Defendants' uncontradicted testimony is that they are losing an average of approximately $30 Thousand Dollars per month in lost sales of Clark parts and Harlan-fabricated parts for Clark trucks because of the Court's temporary restraining order. Defendants also testified that they have invested $2 Million Dollars in the purchase of machinery to fabricate parts during the three years since Clark first observed copies of its microfilm on defendants' premises, but about which took no action.

The cost to plaintiff of its complex parts-identification system is over $1 Million Dollars per year. However, defendants' possession and use of the microfilm will not affect that cost; Clark will incur that cost each year regardless of whether defendants keep and use the tapes or not. Plaintiff, in its post-hearing brief, argues that it will be nearly impossible to protect plaintiff should the Court dissolve its temporary restraining order. Plaintiff argues that the injury it faces before a final judgment is inherently not remediable in damages. Plaintiff contends it would be nearly impossible to establish what portion of future parts sales by defendants was due to key-number-only orders which defendants were unable to fill by reference to the microfilm, and what proportion of such orders would have gone to Clark dealers but for defendants' access to the microfilm.

The balance of harm test weighs the trouble, expense and confusion that would be incurred by defendants and their customers if the injunction is granted against the confusion and potential loss to sales that will be suffered by plaintiff and its customers if the injunction does not issue. Wright & Miller, *Federal Practice and Pro-*

*cedure*, § 2948. The Court finds that the interference to defendants' business and the irreparable loss of good will associated with defendants' inability to fill orders under our restraining order, tips the balance of equities against plaintiff on this question. Also, plaintiff's long delay in instituting this lawsuit after learning of the threatened harm is an indication that the harm is not serious enough to justify preliminary injunction. Furthermore, plaintiff's failure to show likelihood of success on the merits convinces the Court that it would be unfair to defendants to order the extraordinary remedy requested by plaintiff. *Klauber Bros. Inc. v. Lady Marlene Brassiere Corp., supra. See also*, Wright & Miller, *Federal Practice & Procedure*, § 2948, at p. 438, fn. 31.

## D. *The Public Interest*

The public interest is, of course, best served by strictly upholding the copyright laws. The copyright laws, however, do not protect one who has acquiesced in the wide circulation of copies of his works without reserving his copyright. *Stuff v. E. C. Publications, Inc.*, 342 F.2d 143, 145 (2nd Cir. 1965).

## III

### SUMMARY AND CONCLUSION

For the reasons stated above, we find that the factors to be considered on this Rule 65 motion for preliminary injunction weigh in favor of defendants. The Court finds there is no need to restrain defendants from possessing and using the Clark Equipment Company Micro-Master Parts Microfilm pending a final judgment on the merits. The Court, however, will continue to enjoin defendants from making further copies of this microfilm, or the microfische in its possession, or selling the same to any other person.

IT IS, BY THE COURT THEREFORE ORDERED that pending a final judgment on the merits, defendants, their agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through or under them be and are hereby restrained

from copying, selling, transferring, offering to sell, advertising for sale, shipping, delivering, distributing or disposing in any way of the Clark Micro-Master Parts Program tapes, cartridges, copies, microfilms, negatives, transcriptions, copies, notes, descriptions, accounts or information.

IT IS BY THE COURT FURTHER ORDERED that the Court's writ of seizure and impoundment is hereby dissolved, and the United States Marshal for the District of Kansas is hereby directed to return forthwith to defendants the items seized from defendants pursuant to that writ.

IT IS FURTHER ORDERED that plaintiff's bond in the amount of $50 Thousand Dollars be continued in the same amount pending final judgment on the merits.

IT IS FURTHER ORDERED that plaintiff's motion for preliminary injunction be granted in part and denied in part as appears more fully herein.