UNIVERSAL CITY STUDIOS, INC. a corporation, dba Universal Television and Universal Pictures, and Walt Disney Productions, a corporation, Appellants and Cross-Appellees,

v.

SONY CORPORATION OF AMERICA, a corporation, The Sony Corporation, a corporation, Carter Hawley Hale Stores, Inc., a corporation, Associated Dry Goods Corporation, a corporation, Federated Department Stores, Inc., a corporation, Henry's Camera Corporation, a corporation, Doyle Dane Bernbach, Inc., a corporation, and William Griffiths, Appellees and Cross-Appellants.

Nos. 79–3683, 79–3735 and 79–3762.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 6, 1981.

Decided Oct. 19, 1981.

Rehearing and Rehearing In Banc Denied Jan. 12, 1982.

Stephen A. Kroft (on brief), John G. Davies and Sondra E. Berchin, Rosenfeld, Meyer & Susman, Beverly Hills, Cal., argued, for Universal Studios and Walt Disney.

Dean C. Dunlavey, Gibson, Dunn & Crutcher, Los Angeles, Cal., for Sony, Sony America, Doyle, Dane, Bembach.

Before KILKENNY and CANBY, Circuit Judges, and EAST, District Judge.[*]

KILKENNY, Circuit Judge:

Appellants, Universal City Studios, Inc. (Universal) and Walt Disney Productions (Disney), producers and copyright owners of audiovisual materials, some of which they choose to telecast over the public airwaves, brought this copyright infringement claim against Sony Corporation (Sony), the manufacturer of the Betamax, a videotape recorder (VTR), and Betamax tapes, Sony Corporation of America (Sonam) (the American distributor of the Betamax), four retail establishments that sell the Betamax, Doyle Dane Bernbach, Inc. (DDBI) (the advertising agency retained by Sonam to promote the Betamax), and one individual (William Griffiths), who is an owner and user of the Betamax.

Appellants argue that home video recording of their copyrighted works constitutes copyright infringement and that the corporate defendants are liable as direct, contributory and/or vicarious infringers. Additionally, appellants contend that the retail defendants violated the copyright laws when they recorded portions of appellants' programs to demonstrate the Betamax to a prospective purchaser. Likewise, appellants presented additional claims arising under state law and sought broad injunctive relief, as well as profits and damages. The district court, after three years of litigation and a five week nonjury trial, in the reported case of *Universal City Studios, Inc. v. Sony Corp. of America*, 480 F.Supp. 429 (C.D.Cal.1979), entered judgment for appellees and held:

(1) that copyright holders of audiovisual materials, some of which are sold for telecast over public airwaves, did not have monopoly power over off-the-air copying of those materials by owners of a videotape recorder in their homes for private, non-commercial use;

(2) the retailer did not infringe upon the copyrights where it did not compete with nor profit from materials and intended only to demonstrate the recorder;

(3) even if home-use copyrighting constituted an infringement, neither manufacturers, distributors, retailers, nor advertisers were liable under theories of direct or contributory infringement, or vicarious liability;

(4) that even if the appellees were deemed liable, injunctive relief was not available where they did not unfairly compete with owners of copyrighted materials, nor interfere with their advantageous business relations.

## FACTUAL BACKGROUND

The district court in its elaborate, painstaking, and thoughtful opinion, *Universal City Studios v. Sony Corp. of America, supra*, at 432, 442, carefully outlined the facts and the parties' contentions. In our view it would be a complete waste of judicial time and effort and of no benefit to the Bench or Bar to here repeat those facts and contentions.

## ISSUES

I. Does off-the-air copying of copyrighted audiovisual materials by owners of a

[*] The Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

videotape recorder in their homes for private noncommercial use constitute an infringement?

II. Are the corporate appellees liable for infringement under any of the theories advanced?

III. If appellants are entitled to prevail, the nature of the relief to be granted.

IV. Retail store use of the copyrighted material.

V. Unfair competition claims under 15 U.S.C. § 1125(a) and state law.

## I.

Our comments under this issue include:

(a) whether the district court committed error in finding an implied video recording exception in the applicable legislation, and

(b) whether home video recording constitutes fair use.

Article I, § 8, cl. 8 of the United States Constitution empowers the Congress: "To promote the progress of science and useful arts, by securing, for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries." In commenting on this clause of the Constitution, our Supreme Court has said that "The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.'" *Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954). Despite what is said in some of the authorities that the author's interest in securing an economic reward for his labors is "a secondary consideration," it is clear that the real purpose of the copyright scheme is to encourage works of the intellect, and that this purpose is to be achieved by reliance on the economic incentives granted to authors and inventors by the copyright scheme. This scheme relies on the author to promote the progress of science by permitting him to control the cost of and access to his novelty. It is based on the premise that the exclusive right granted by the copyright laws "will not impose unacceptable costs to society in terms of limiting access to published works or pricing them too high." The district court relied heavily on its conclusion that the Copyright Act of 1976, providing that copyright holders have monopoly power over all productions of their works, did not include reproduction of sound recordings for home use. See 17 U.S.C. §§ 106(1), (4), (5) and 107. In arriving at this conclusion, the court compared the Copyright Act of 1909, which created the fair-use doctrine to immunize some forms of copying from the literal implications of the Act. 17 U.S.C. (1970 Ed.) § 1 with the language of 17 U.S.C. § 106 of the New Act which provides:

"Subject to sections 107 through 118, the *owner of copyright under this title has the exclusive rights to do and to authorize any of the following*:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture of other audiovisual work, to display the copyrighted work publicly." [Emphasis added.]

"The approach of the [statute] is to set forth the copyright owner's exclusive rights in broad terms in section 106, and then to provide various limitations, qualifications, or exemptions in the 12 sections that follow. Thus, everything in section 106 is made 'subject to sections 107 through 118,' and must be read in conjunction with those provisions." H.R. No. 94–1476, p. 61 Sept. 3,

1976, reprinted 1976 U.S.Code Cong. & Admin.News, 5659 at 5674, 94th Congress, 2d Sess.

The statutory framework is unambiguous; the grant of exclusive rights is only limited by the statutory exceptions. Elementary principles of statutory construction would indicate that the judiciary should not disturb this carefully constructed statutory scheme in the absence of compelling reasons to do so. That is, we should not, absent a clear direction from Congress, disrupt this framework by carving out exceptions to the broad grant of rights apart from those in the statute itself. It is the duty of the courts to give faithful meaning to the language Congress adopted in the light of the evident legislative purpose in enacting the law in question. *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979); *United States v. Bornstein*, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976); *Commissioner v. Bilder*, 369 U.S. 499, 82 S.Ct. 881, 8 L.Ed.2d 65 (1962); *Church of Scientology of California v. U. S. Dept. of Justice*, 612 F.2d 417 (C.A.9 1979).

Our study of the record and analysis of the legislation convinces us that the district court inadvertently bypassed the statutory framework of the 1976 legislation and, in particular, § 106 of the new Act. In commenting on the "broad language" of the new Act, the district court expressed the belief that despite the monopoly power over all reproductions of their works granted by § 106, nonetheless, the legislative history indicated to the contrary. We quote from its opinion:

"The broad language of the New Act suggests that copyright holders have monopoly power over all reproductions of their works. Legislative history, however, shows that Congress did not intend this broad statement to include reproductions of sound recordings for home use. The central question here is whether Congress intended the same language to give copyright holders of audiovisual works monopoly power over off-the-air recording of their works for home use. Legislative history does not show this intent." 480 F.Supp. at 443.

By characterizing its task as a search for whether Congress intended to afford protection, the district court misapprehended the scope of the relevant inquiry. The issue is not whether Congress exhibited an intent to protect a copyright holder from certain reproduction of his works. It had already expressed its intent to do so by extending the "bundle of rights" set forth in § 106 to copyright owners, *subject to specific sections*, to-wit: §§ 107–118. Consequently, our concern must be whether Congress has exhibited the intent to limit the rights of copyright owners in ways not specified in §§ 107–118. When one analyzes whether there exists an implied home video recording exception, apart from the fair use doctrine, in the light of the statutory framework, it is manifest that the district court's conclusion was erroneous. While the sound recording situation is analogous, there are a number of reasons why sound recordings should receive different judicial treatment.[1] The difference between these two approaches—did Congress intend to afford protection or did Congress intend to withdraw protection—is more than a matter of semantics.[2]

---

1. The district court's reasoning has been subject to a number of criticisms. Note, *Universal City Studios, Inc. v. Sony Corp.*: 'Fair Use' Looks Different on Videotape. 66 Va.L.Rev. 1005, 1011–12 (1980). Note, The *Betamax* Case: Accommodating Public Access and Economic Incentive in Copyright Law, 31 Stan.L. Rev. 243, 247 n. 18 (1979); 8 N.Y.U.Rev.L. & Soc. Change, 45, 48–51, 1978–79; Note, Copyright—The Home Video Recording Controversy, 81 W.Va.L.Rev. 231, 245–247 (1979).

2. Most of the commentators have found problems with the reasoning underlying the district court's conclusion. 3 *Nimmer on Copyright*, § 13.05[F][5] at 13–95–96, n. 159 (1981); *Universal City Studios, Inc. v. Sony Corp.*: 'Fair Use' Looks Different on Videotape, 66 Va.L. Rev. 1005, 1011–12 (1980); Note, The *Betamax* Case: Accommodating Public Access and Economic Incentive in Copyright Law, 31 Stan.L. Rev. 243, 247, n. 18 (1979); 8 N.Y.U.Rev.L. &

First, the copyright statute treats sound recording and audiovisual works as separate categories of protected materials.[3] And Congress has shown "special solicitude for audiovisual works."[4] For example, audiovisual materials are specifically excluded from some exemptions by the 1976 Act. 17. U.S.C. §§ 108(h), 110(*1*), 112(a). Section 108 provides strong support for the conclusion that Congress was concerned about unauthorized reproduction of audiovisual works, whether or not such reproductions were for profit. Section 108(h) excludes audiovisual works other than an audiovisual work dealing with the news from the limited exception provided by § 108. The House Report dealing with § 108(h) indicates that the doctrine of fair use may have a limited application to the reproduction of such works. House Report at 1976 U.S.Code Cong. & Admin.News at 5692. In addition, even as to audiovisual news programs, which are subject to the § 108 exemption, the H.R. notes, in regard to § 108(f)(3), that:

> "It is intended to permit libraries and archives, subject to the general conditions of this section, to make off-the-air videotape recordings of daily network newscasts for limited distribution to scholars and researchers for use in research purposes. As such, it is an adjunct to the American Television and Radio Archive established in Section 113 of the Act which will be the principal repository for television broadcast material, including news broadcasts. The inclusion of language indicating that such material may only be distributed by lending by the library or archive is intended to preclude

performance, copying, or sale, whether or not for profit, by the recipient of a copy of a television broadcast taped off-the-air pursuant to this clause." 1976 U.S.Code Cong. & Admin.News at 5690–91.

In light of this caution with respect to the limited § 108 exemption, it is clear that Congress did not intend to create a blanket exemption for home video recording, even when the recording is not for a commercial purpose.

Second, much of the underlying rationale for the recognition of an exemption for the home recording of sound recordings is simply not applicable to videorecording. Congress, when it granted limited copyright protection to sound recordings for the first time in 1971, made it clear in the legislative history that:

> "In approving the creation of a limited copyright in sound recordings it is the intention of the Committee that this limited copyright not grant any broader rights than are accorded to other copyright proprietors under the existing title 17. Specifically, it is not the intention of the Committee to restrain the home recording, from broadcasts or from tapes or records, of recorded performances, where the home recording is for private use and with no purpose of reproducing or otherwise capitalizing commercially on it. *This practice is common and unrestrained today*, and the record producers and performers would be in *no different position* from that of the owners of copyright in recorded musical compositions over the past 20 years." [Emphasis added.] U.S. Code Cong. & Admin.News 1971, 1566 at 1572.[5]

Soc. Change 45, 48–51 (1978–79); Note, Copyright—The Home Video Recording Controversy, 81 W.Va.L.Rev. 231, 245–47 (1979); Marsh, *Betamax and Fair Use: A Shotgun Marriage*, 21 Santa Clara L.Rev. 49, 61–67 (1981).

**3.** 17 U.S.C. § 102 lists seven illustrative categories of "works of authorship" which are copyrightable. Section 102(a)(6) is "motion pictures and other audiovisual works" and § 102(a)(7) is "sound recordings."

**4.** This reflects, no doubt, the relatively large economic investment involved in the creation of audiovisual works and the especial danger

posed by unauthorized reproductions. *See* Marsh, *Betamax and Fair Use: A Shotgun Marriage*, 21 Santa Clara L.Rev. 49, 64–66 (1981).

**5.** This language was not repeated in the legislative history accompanying the 1976 Act. The district court did not find this significant. Nimmer has commented that:

> "This conclusion seems questionable on several grounds. First, the failure to repeat in the Committee Reports for the current Act an intention to recognize the home recording exemption referred to in the House Report for the 1971 Amendment is at least as con-

Beyond question that statement was not intended to apply equally to home video recording.[6] Perhaps most importantly, Congress simply was not addressing the problem of home video recording. Certainly in 1971, home video recording did not present Congress with a "common and unrestrained practice" developed in a period when copyright protection was wholly lacking.[7]

There is no clear legislative language indicating that home video recording is not within the exclusive rights granted by § 106. The statute itself and the House and Senate Reports accompanying the 1976 Act do not provide for a broad based home use exception. There was never a considered review of the home video recording problem. The statements supporting the district court's conclusion[8] hardly represent— when considered in the context in which they were made and in the context of the 20 year copyright revision process—a firm expression of Congressional intent to carve out a major exception to the copyright scheme.

The legislative history of the 1971 Amendment, heavily relied upon by the dis-

trict court as disclosed by its opinion, 480 F.Supp. pages 444 and 445, is entirely beside the point. It is clear that the history relied upon, H.R. No. 487, 92d Cong., 1st Sess. 7, Reprinted [1971] U.S.Code Cong. & Admin.News, pages 1566, 1572, was not intended to apply equally to video home recording. We have emphasized this point in our footnote 6. Above all, it must be recognized that the Congress was in no way addressing the problem of video recording in its discussion of the 1971 legislation. Consequently, the analogy the district court attempted to draw between that legislation and the Act of 1976 is simply without foundation. There is absolutely nothing in the 1971 legislation which would indicate that the Congress was in any way concerning itself with home video recording. It is well settled that silence cannot be viewed as an expression of Congressional intent. *Turpin v. Mailet*, 579 F.2d 152 (C.A.2 1978), vacated, 439 U.S. 974, 99 S.Ct. 554, 58 L.Ed.2d 645, 591 F.2d 426 (C.A.2 1979). Beyond that, where the meaning of a statute is clear and unambiguous, it would be highly improper to construe inconclusive legisla-

---

sistent with an altered intention upon the part of the Congress enacting the Act of 1976. This is particularly true in view of the fact that other passages from the House Report for the 1971 Amendment were incorporated verbatim in the House Report for the current Act. ... There is further the fact that the Amendment of 1971 was itself legislation limited to the creation of copyright in sound recordings, and did not (in this context) purport to affect the copyright in musical or other works which may be contained in such sound recordings. Therefore, the home recording exemption referred to in the House Report for the 1971 Amendment could only be applicable to the sound recording copyright, not to the copyright in any underlying work contained therein.... Finally, it is to be noted that the House Report for the current Act states that 'it is not intended to give [taping] any special status under the fair use provision or to sanction any reproduction beyond the normal and reasonable limits of fair use.' H.Rep., p. 66." 3 Nimmer, *supra*, § 13.05[F][5] at 13–96, n. 159.

6. The House Report to the 1971 Sound Recording Act carefully excluded sounds accompanying motion pictures from the scope of that particular piece of legislation.

"In excluding the 'sounds accompanying a motion picture' from the scope of this legislation the Committee does not intend to limit or otherwise alter the rights that exist currently in such works. The exclusion reflects the Committee's opinion that soundtracks or audio tracks are an integral part of the 'motion pictures' already accorded protection under subsections (*l*) and (m) of Section 1 of title 17, and that the reproduction of the sound accompanying a copyrighted motion picture is an infringement of copyright in the motion picture...." 1971 U.S.Code Cong. & Admin.News at 1570–71.

7. Motion pictures had been protected by the copyright laws since 1912.

8. See 480 F.Supp. at 445–46. The statements of Barbara Ringer and Representative Kastenmeier were made extemporaneously at a committee hearing and on the House floor respectively, and they were in connection with the Sound Recording Act of 1971. The statements do not represent a considered review of the home videorecording problem, and even these statements do not clearly establish an intent to exempt unauthorized reproductions *apart from the fair use doctrine.*

tive history so as to apply a statute in a manner inconsistent with its claimed meaning. *United States v. Wilson*, 591 F.2d 546 (C.A.9 1979).

Resort to the legislative history of an Act is entirely unnecessary when the statute is clear and unequivocal on its face. *United States v. Oregon*, 366 U.S. 643, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961), rehearing denied 368 U.S. 870, 82 S.Ct. 24, 7 L.Ed.2d 70. The legislative history of a statute is not relevant when the terms of the statute are clear and unambiguous. *Natural Resources Defense Council, Inc. v. U. S. Environmental Protection Agency*, 507 F.2d 905 (C.A.9 1974).

■ On this issue, we conclude that off-the-air copying of copyrighted audiovisual materials by owners of videotape recorders in their own homes for private noncommercial use, constitutes an infringement of appellants' copyrighted audiovisual materials.

### FAIR USE DOCTRINE

As indicated by the district court, the analysis of whether the recording was infringement does not end with the statutory language. While the old Act was in effect, the courts pronounced a rule of law known as the doctrine of "Fair Use." This doctrine has been appropriately described as "the most troublesome in the whole law of copyright." *Dellar v. Samuel Goldwyn, Inc.*, 104 F.2d 661 (C.A.2 1939). From its inception, the doctrine has presented members of the judiciary with among the most elusive views that the courts are called upon to decide. It has been said that the doctrine is entirely equitable and is so flexible as virtually to defy definition. *Time, Inc. v. Bernard Geis Associates*, 293 F.Supp. 130 (S.D.N.Y.1968). Time after time the courts have ruled on the Fair Use doctrine, but no real definition of the concept has ever emerged. One of the better definitions is that of the Second Circuit in *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 306 (C.A.2 1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967), where it is said that fair use is "a privilege in others than the owners of a

copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner" by the copyright. The Congress in the legislation of 1976 attempted to define fair use in § 107 which reads:

"Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work."

It is noteworthy that the legislative history of § 107 makes it clear that its statements of the fair use doctrine offer some guidance to users in determining when the principles of the doctrine apply. However, it is there emphasized that the endless variety of situations and combinations of circumstances that can arise in particular cases precludes the formulation of exact rules.

The history states that the legislation endorses the purposes and general scope of the *judicial doctrine* of fair use, but there is no disposition to freeze the doctrine in the statute. We quote from the closing sentence of the history:

"Section 107 is intended to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any

way." U.S.Code Cong. & Admin.News 1976, 5680.

Consequently, and despite what is said by the district court, this fair use analysis is equally applicable to alleged violations under both the Old and the New Act. It is interesting to note that appellees have not suggested that home video recording would not violate the Old Act in the absence of a finding of fair use.

Despite the nebulous character of the doctrine, previous case law and the general copyright scheme do provide us with considerable guidance. As the first sentence of § 107 indicates, fair use has traditionally involved what might be termed the "productive use" of copyrighted material. See 66 Va.L.Rev. at 1012–1014. The purposes listed in § 107 are simply illustrative and not limitative, but they do give some idea of the general orientation of the doctrine. It is noteworthy that the statute does not list "convenience" or "entertainment" or "increased access" as purposes within the general scope of fair use.

Leon Seltzer, in his illuminating book *Exemptions and Fair Use in Copyright* (1978) states:

"The list, casual or studied as it may be, reflects what in fact the subject matter of fair use has in the history of its adjudication consisted in: *it has always had to do with the use by a second author of a first author's work.* Fair use has not heretofore had to do with the mere reproduction of a work in order to use it for its intrinsic purpose—to make what might be called the 'ordinary' use of it. When copies are made for the work's 'ordinary' purposes, ordinary *infringement* has customarily been triggered, not notions of fair use." *Id.* at 24. [Emphasis in original.]

The cases have, for the most part, adhered to this aspect of the fair use doctrine. If an alleged infringer has reproduced a copyrighted work to use it for its intrinsic purpose, fair use has not generally been applied. Nimmer notes, however, that the courts have not adhered to this notion in recent years, and cites two cases as authority—*Williams & Wilkins Co. v. United States*, 487 F.2d 1345 (Ct.Cl.1973), *aff'd by an equally divided court*, 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1975), and the district court's opinion in this case. *Nimmer, supra,* § 13.05[A][1] at 13–58 n. 23.3. *Williams & Wilkins Co.*, which has been appropriately regarded as the "Dred Scott decision of copyright law", 487 F.2d at 1387 (Nichols, J., dissenting), is clearly not binding in this circuit, and, in any event, we find its underlying rationale singularly unpersuasive. The district court, while noting that *Williams & Wilkins Co.* "has little precedential value," 480 F.Supp. at 450, and quoting Nimmer's critique of the opinion, *Id.* at 451, used *Williams & Wilkins Co.'s distortions of the fair use rationale to justify an application of the doctrine which, in our opinion, stretches fair use beyond recognition and undermines our traditional reliance on the economic incentives provided to authors by the copyright scheme.*

In *Williams & Wilkins Co.*, the Court of Claims found that copying by the National Institute of Health (NIH) and the National Library of Medicine (NLM) of entire articles published in plaintiff's journals was fair use. Plaintiff was the publisher of certain medical and scientific journals. The libraries regularly filled requests for journal articles (including some in plaintiff's journals) by photocopying such articles. Under this system, the libraries copied approximately 200,000 articles a year. The majority identified the core of its fair use finding:

"First, plaintiff has not in our view shown, and there is inadequate reason to believe, that it is being or will be harmed substantially by these specific practices of NIH and NLM; second, we are convinced that medicine and medical research will be injured by holding these particular practices to be an infringement; and, third, since the problem of accommodating the interests of science with those of the publishers (and authors) calls fundamentally for legislative solution or guidance, which has not yet been given, we should not, during the period before con-

gressional action is forthcoming, place such a risk of harm upon science and medicine." 487 F.2d at 1354.

We believe that *Williams & Wilkins Co.* is clearly distinguishable. It appears that the Court of Claims was primarily concerned about the serious damage to medical science that would result if it held for the plaintiff. In this case, there is no corresponding countervailing societal benefit to "weigh" against the copyright interests of the author. We do not mean to suggest that increased access to such Disney products as "Chip and Dale/Mixed Nuts" is not a benefit to society. We only mean to say that the consequences attendant upon reduced consumer control of access do not in any way correspond to the deleterious consequences of reduced access identified by the Court of Claims in *Williams & Wilkins Co.*

Aside from the obvious distinctions between *Williams & Wilkins Co.* and the instant case, we believe that the Court of Claims' approach—in treating intrinsic use of such work as within the bounds of fair use—created doctrinal confusion that raises the spectre of the evisceration of the traditional workings of the copyright scheme. As Seltzer has stated:

> "The traditional fair use notion has had to do with the sort of access that the mind of a user has to a copyrighted work: the work is instantly accessible on sight or hearing, and the question is what the second user would or should be allowed to 'do' with it—or, more accurately, what the creator of the work ought to have expected him freely to do with it. Use for photocopying and phonorecording involves a different sort of access: the possibility—and the capability—of instant reproduction of the work in the same mode and for the same purpose the original was in the first place acquired. With the first sort of access and use we can deal under notions of fair use, even when it involves photocopying, for appropriate expectations of economic reward are essentially unchanged. *The second kind of access and use triggers questions of reallocation of costs, however, and insofar as a use is of that sort, it is appropriately dealt with as an exemption from the normal workings of the copyright scheme, . . .*" Seltzer, *supra*, at 37–38. [Emphasis added.]

Seltzer concludes that exemptions from the normal workings of the copyright scheme, because they involve the reallocation of costs, are matters for Congress, not the courts.

We hold that, particularly in the context of new technology, there is a danger to including the sort of copying involved in *Williams & Wilkins Co.* within the scope of the fair use doctrine. New technology, which makes possible the mass reproduction of copyrighted material (effectively taking control of access from the author), places a strain upon the fair use doctrine. A court, if it decides that fair use is applicable, is required to weigh—in "balancing the equities"—the "benefit" of an extremely popular increase in access with the "harm" to a plaintiff. The harm to a copyright plaintiff is inherently speculative, and as *Williams & Wilkins Co.* and the district court decision indicate, a plaintiff is faced with the unenviable task of proving the nonexistence of fair use, which has typically been viewed as a *defense.*

The costs are also important. They fall primarily into two categories. First, the result of applying fair use to intrinsic use cases like *Williams & Wilkins Co.* and this case is a fundamental restructuring of the copyright system not justified by the statutory scheme or traditional notions of fair use. Second, the framework for copyright litigation this view establishes is ultimately hostile and extremely adverse to the rights of copyright holders. It places them in the unenviable position of proving damage in a context in which extreme difficulty is acknowledged.

As a society, we may decide that these costs *are* acceptable. But, that branch of public policy determination is preeminently a decision for the legislative branch.

■ It is our conviction that the fair use doctrine does not sanction home videorecording. Without a "productive use", *i. e.*

when copyrighted material is reproduced for its intrinsic use, the mass copying of the sort involved in this case precludes an application of fair use. An analysis of the four factors listed in § 107 does not dictate a contrary result.

A consideration of the first factor—"the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"—does not aid appellees' case. The district court noted that "Courts have traditionally applied this factor by asking whether the copyrighted material is used for criticism, research or other independent work." 480 F.Supp. at 453. The fact that the use involved does not further a traditionally accepted purpose clearly weighs against a finding of fair use. The district court, however, emphasized the noncommercial[9] and home use of the copyrighted material. The statute does not, however, draw a simple commercial/noncommercial distinction. The statute contrasts commercial and non-profit educational purposes, and there is no question that the copying of entertainment works for convenience does not fall within the latter category. The fact that the "infringing" activity takes places in the homes does not warrant a blanket exemption from any *liability*. It seems more appropriate to address the privacy concerns raised by the district court in fashioning the appropriate relief. The suggestion that First Amendment concerns support the purpose of Betamax users to increase the access to copyrighted materials is wholly without merit. "The first amendment is not a license to trammel on legally recognized rights in in-

tellectual property." *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (C.A.5 1979); *Walt Disney Productions v. Air Pirates*, 581 F.2d 751, 759 (C.A.9 1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979); *Sid & Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157, 1160–1171 (C.A.9 1977).

The second factor—"the nature of the copyrighted work"—does not support a finding of fair use. The legislative history and the case law dealing with this factor are rather sparse, but there seems to be some indication that the scope of fair use is greater when informational type works, as opposed to more creative products, are involved. Seltzer, *supra*, at 33–34; Nimmer, *supra*, § 13.05[A][2] at 13–61. The courts inquire whether the nature of the material is such that additional access "would serve the public interest in the free dissemination of information." *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d at 307; *Time, Inc. v. Bernard Geis Associates*, 293 F.Supp. 130, 146 (S.D.N.Y.1968). If a work is more appropriately characterized as entertainment, it is less likely that a claim of fair use will be accepted.[10] The district court, however, found it significant that "This case involves only that copyrighted material which plaintiffs voluntarily choose to have telecast over public airwaves to individual homes free of charge." 480 F.Supp. at 453. We fail to see how the method by which appellants have chosen to distribute their works is relevant to this factor of the fair use analysis. We are in

9. "[C]ommercial use tends to cut against a fair use defense." *Triangle Publications, Inc. v. Knight-Ridder Newspapers*, 626 F.2d 1171, 1175 (C.A.5 1980) (footnote omitted). Noncommercial motive does not mean fair use. 66 Va.L.Rev. at 1017; Marsh, *supra*, at 68–71. The "noncommercial" characterization of home videorecording is a bit misleading. The corporate defendants involved in the lawsuit are obviously not in the business of promoting home videorecording for strictly altruistic reasons.

10. *Rohauer v. Killiam Shows, Inc.*, 379 F.Supp. 723, 733 (S.D.N.Y.1974), *rev'd on other grounds*, 551 F.2d 484 (C.A.2 1977), *cert. denied*, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d

266 ("There is no discernible public interest in the dissemination of 'The Son of the Sheik' sufficient to justify the infringement.... It can scarcely be argued here that the enduring fame of Rudolph Valentino or the intrinsic literary and historical merit of 'The Son of the Shiek' (whatever it may be) serves any public interest sufficient to endow these defendants with the privilege of fair use."); *Loew's Inc. v. Columbia Broadcasting System*, 131 F.Supp. 165, 175 (S.D.Cal.1955), *aff'd sub nom. Benny v. Loew's, Inc.*, 239 F.2d 532 (C.A.9 1956), *aff'd. by an equally divided court*, 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583 (1958).

substantial agreement with one commentator's discussion of the district court's analysis on this issue:

"While this attribute of the broadcast industry complicates the economic harm analysis, it has no bearing on society's interest in the dissemination of the material or the author's reasonable expectation of compensation for repeated use of his material. These issues, basic to the rationale of the fair use doctrine, implicate the intrinsic qualities of the work, not the medium of its presentation. The *Sony* court's analysis obfuscated the real issue at stake: whether the public interest in promoting the development of art and science dictates disregarding a copyright holder's interest in controlling the use of his product. In *Sony*, the copyright owner's interest should have taken precedence." 66 Va.L.Rev. at 1020–21.

The third factor—"the amount and substantiality of the portions used in relation to the copyrighted work as a whole"—clearly weighs against a finding of fair use. The district court acknowledged that "Home use recording off-the-air usually involves copying the entire work," 480 F.Supp. at 454, and that this typically precludes a finding of fair use. The court concluded, however, that the courts have *only* been concerned about the "substantiality" of the copying when it produced harm, and that "this taking of the whole still constitutes fair use, because there is no accompanying reduction in the market for 'plaintiff's original work.'" *Id.* We believe that this view of the case law is completely wrong.

In *Walt Disney Productions v. Air Pirates, supra,* we stated "While other factors in the fair use calculus may not be sufficient by themselves to preclude the fair use defense, this and other courts have accepted the traditional American rule that excessive copying precludes fair use." *Id.* at 758. In addition, the district court in *Loew's Inc. v. Columbia Broadcasting System*, 131 F.Supp.

165 (S.D.Cal.1955), stated "The mere absence of competition or injurious effect upon the copyrighted work will not make a use fair. The right of a copyright proprietor to exclude others is absolute and if it has been violated the fact that the infringement will not affect the sale or exploitation of the work or pecuniarily damage him is immaterial." *Id.* at 184. A panel of this court later affirmed *Benny v. Loew's, Inc.,* 239 F.2d 532 (C.A.9 1956), and specifically noted that "The judgment is affirmed upon the findings of fact and conclusions of law of the district court and for the reasons set forth in the opinion of [the district judge]." *Id.* at 537. These cases clearly did not limit their discussion of "substantiality" to cases in which the plaintiff had been harmed. It seems clear that these cases are based, in part, on the notion that copyright is a property interest and that it is impermissible, in the vast majority of cases, to "appropriate" the copyrighted material without the owner's consent. The copyright laws afford the author the right to control access to his work, and, absent compelling justifications, this right should not be abridged.

We need not rest our holding on the applicability of the "substantiality" discussion in *Air Pirates* and *Loew's* to the home videorecording context, but it seems clear that this factor in the fair use calculus weighs heavily in appellants' favor.

The fourth factor—"the effect of the use upon the potential market for or value of the copyrighted work"—does not support a contrary result. In light of the preceding discussion, we do not believe that it is necessary to address the harm issue with respect to the liability question. We feel compelled, however, to express our disagreement with the district court's approach on this issue.

First, it seems apparent that the district court was much too strict in requiring appellants to establish its degree of harm.[11]

---

11. The courts typically state that irreparable harm is presumed. *Encyclopaedia Britannica Educational Corp. v. Crooks*, 447 F.Supp. 243, 247, 251 (W.D.N.Y.1978). The presumption noted in *Crooks* was not because of the proce-

dural posture (motion for preliminary injunction). The court noted that, at trial, the defendant would have an opportunity to rebut the presumption. In our case, it is clear that appel-

Our sentiments are the same as those of one of the dissenters in *Williams & Wilkins Co.* who stated, "Although the court states that it rejects the trial determinations as to both actual and potential damage to plaintiff, I think the opinion shows that the court's conclusion is based primarily on its finding that *plaintiff failed to prove actual damages*." 487 F.2d at 1367 (Cowen, C. J., dissenting). [Emphasis added.] That is simply too great a burden to impose on copyright plaintiffs. Nimmer has suggested that "the central question in the determination of fair use is whether the infringing work *tends* to diminish or prejudice the potential sale of plaintiff's work." 3 Nimmer, *supra*, § 13.05[E][4][c] at 13–84. [Emphasis added] [Footnote omitted.] [12] Under this sort of standard, it seems clear that appellants should have prevailed. Since the copies made by home videorecording are used for the same purpose as the original, a finding of fair use is not justified.[13] The district court seems to recognize, on several occasions, that appellants will have to take affirmative steps to compete with the appropriated versions of their work. That such competition is necessary supports appellants' allegations of harm; at the least, it makes clear that the "infringing" activity *tends* to prejudice the potential sale of appellants' work. It is clear that home users assign economic value to their ability to have control over access to copyrighted works. The copyright laws would seem to require that the copyright owner be given the opportunity to exploit this market.

Second, we do not believe that the district court paid sufficient attention to the fact that it is extremely difficult for a copyright plaintiff to prove harm from the activities of specific defendants. 3 Nimmer, supra,

§ 13.05[E][4][c]. As Nimmer states, "Far from this justifying a defense of fair use, failure to prove damages will in the usual case give rise to a minimum statutory damages liability. It is only when the general dissemination of an allegedly infringing work by all potential defendants, and without limitation as to the number of reproductions, and volume of users would still not adversely affect the plaintiff's potential market that a conclusion of fair use may be justified." *Id.* at 13–84.[14] The district court quoted, in what seemed to be an approving manner, similar sentiments from one of Nimmer's law review articles, but the court clearly did not use this rationale in deciding the fair use question. The court, in analyzing the fourth fair use factor, did not pay sufficient attention to the *cumulative* effect of mass reproduction of copyrighted works made possible by videorecorders. It seems clear that absent an inquiry which takes into consideration the full scope of the "infringing" practice, copyright plaintiffs, in cases of this sort, would face insuperable obstacles to the protection of their rights. And, where one looks at the full scope of the activity in question, it seems clear that it tends to diminish the *potential* market for appellants' works.

## II.

### LIABILITY OF CORPORATE DEFENDANTS

■ We disagree with the district court's conclusion that even if it were to hold that home-use copying was an infringement under the Old and the New Acts and was not fair use, the court could not find the appellees Sonam, Sony, DDBI and the four retail stores liable for this type of infringement. 480 F.Supp. at 457.

---

lees did not establish with any degree of certainty that such harm was not likely to occur.

**12.** The Second Circuit has used this approach. *Meeropol v. Nizer*, 560 F.2d 1061, 1070 (C.A.2 1977).

**13.** Put another way, because the copies serve the same function as the original, the "functional test" suggests that fair use is not available. 3 Nimmer, *supra*, § 13.05[B]; *Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Co-*

*operative Productions, Inc.*, 479 F.Supp. 351 (N.D.Ga.1979).

**14.** Senate Report 94–473 seems to express a somewhat similar concern about mass proliferation of minor infringements: "Isolated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented." *Id.* at 65.

At the outset, it is necessary to make a couple of observations about the district court's analysis. The court relied heavily on a "staple item of commerce" [15] theory in rejecting appellants' claims. The district court stated that "Selling of a staple article of commerce—*e. g.*, a typewriter, a recorder, a camera, a photocopying machine— technically contributes to any infringing use subsequently made thereof, but this kind of 'contribution,' if deemed sufficient as a basis for liability, would expand the theory beyond precedent and arguably beyond judicial management." 480 F.Supp. at 461. This reliance on the "staple article of commerce" theory was inappropriate. Appellees' analogy of videotape records to cameras or photocopying machines may have substantial benefit for some purposes, but does not even remotely raise copyright problems. Videotape recorders are manufactured, advertised, and sold for the primary purpose of reproducing television programming. Virtually all television programming is copyrighted material.[16] Therefore, videotape recorders are not "suitable for substantial noninfringing use." See 3 Nimmer *supra*, § 12.04[A] at 12–39, 12–40. That some copyright owners choose, for one reason or another, not to enforce their rights does not preclude those who legitimately choose to do so from protecting theirs.

A second observation about the district court's analysis is in order. The court found that the corporate appellees' knowledge was insufficient to make them contributory infringers. This was based, in part, on the court's assertion that "defendants here could not know what copyright law required. Before this lawsuit, that issue had not been determined." 480 F.Supp. at 460. It is not necessary that an alleged contributory infringer have actual knowledge that activity which he *makes possible*

constitutes a copyright infringement. A copyright defendant's "innocence" does not absolve him of liability; it only affects the remedies available.[17] For example, the statute provides for a *reduction* of statutory damages if the infringer "was not aware and had no reason to believe that his or her acts constituted an infringement of copyright," 17 U.S.C. § 504(c)(2), and a *remission* of statutory damages, *in limited circumstances*, if the "infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use." *Id.* In this context, a defendant's mistake as to the legal consequences of his actions does not constitute an excuse for an infringement. It is only necessary that a copyright defendant have knowledge of the infringing *activity*. It cannot be argued that the corporate appellees cannot be held to have the knowledge that the Betamax will be used to reproduce copyrighted material, some of which appellants own. We adopt the district court's definition: "[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (C.A.2 1971) (footnote omitted). There can be no doubt that the corporate appellees meet this definition.

First, the knowledge element is clearly satisfied. The corporate appellees "know" that the Betamax will be used to reproduce copyrighted materials. In fact, that is the most conspicuous use of the product. That use is intended, expected, encouraged, and the source of the product's consumer appeal. The record establishes that appellees knew and expected that Betamax's major use would be to record copyrighted programs off-the-air. Second, there is no doubt that appellees have met the other

---

15. See 35 U.S.C. § 271(c) (defining contributory infringement in patent context and providing for exception for "a staple article or commodity of commerce suitable for substantial noninfringing use"); *Aro Mfg. Co. v. Convertible Top Co.*, 377 U.S. 476, 488–89, 84 S.Ct. 1526, 1533–34, 12 L.Ed.2d 457 (1964).

16. For examples, see Nimmer, *supra*, § 12.-04[A] at 12–39–40.

17. 3 Nimmer, *supra*, § 13.08. This discussion of "liability" obviously only pertains to civil, not criminal, liability.

requirements for contributory infringement —inducing, causing, or materially contributing to the infringing conduct of another. The corporate appellees are sufficiently engaged in the enterprise to be held accountable. *See generally* 66 Va.L.Rev. at 1021–24; 31 Stan.L.Rev. at 257–260; 52 S.Cal.L.Rev. at 601–607; 81 W.Va.L.Rev. at 247–49.

### III.

### RELIEF

Because we have found that home videorecording constitutes copyright infringement and that appellees are liable for such use, the district court's judgment must be reversed and the case remanded for a consideration of the appropriate relief. The relief question is exceedingly complex, and the difficulty in fashioning relief may well have influenced the district court's evaluation of the liability issue. The difficulty of fashioning relief cannot, however, dissuade the federal courts from affording appropriate relief to those whose rights have been infringed.

Appellants stated at oral argument that they were seeking a remand to the district court so that the district court could fashion the appropriate relief. This approach makes a good deal of sense; a district court is in a better position to resolve, in an appropriate fashion, the relief question.

There are a number of possibilities that the district court may want to consider. Because of the difficulty of proving the precise nature of the harm to appellants, statutory damages may be appropriate. 17 U.S.C. § 504(c). The district court also has a broad range of equitable remedies from which to choose. Section 502(a) provides that the court "may ... grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." The district court determined that an injunction would not be an appropriate remedy. 480 F.Supp. 463–69. The court should reconsider this action.

We note that, as a general rule, a copyright plaintiff is entitled to a permanent injunction when liability has been established and there is a threat of continuing violations. Indeed, Nimmer states that "Generally, it would appear to be an abuse of discretion to deny a permanent injunction where liability has been established and there is a threat of continuing infringement." 3 Nimmer, *supra*, § 14.06[B] at 14–53—14–54. In discussing the analogous photocopying area, Nimmer suggests that when great public injury would result from an injunction, a court could award damages or a continuing royalty.[18] This may very well be an acceptable resolution in this context.

In fashioning relief, the district court should not be overly concerned with the prospective harm to appellees. A defendant has no right to expect a return on investment from activities which violate the copyright laws. Once a determination has been made that an infringement is involved, the continued profitability of appellees' businesses is of secondary concern.

### IV.

### RETAIL STORE USE

We find no error with the district court's discussion of the fair use question in regard to the retail store use. Therefore, we affirm that portion of the decision.

---

18. "Ordinarily it would be improper, and even an abuse of discretion for a court to deny a permanent injunction where liability and a threat of continuing infringement have both been established. But if one looks to other areas of property law it is clear that a property owner may be denied a permanent injunction against further violations of his property right where such an injunction would work a substantial injury to the public interest as well as to that of the particular defendant. *In such circumstances the property owner may be awarded, in lieu of an injunction, a reasonable royalty for the further use of his property. The courts might well conclude that photocopying practices for private use, particularly in the area of scientific writings, involve just such a public interest, so that a judicially created compulsory license as a substitute for injunctive relief could be found appropriate.*" 3 Nimmer, supra, § 13.-05[E][4][e] at 13–91. [Emphasis added.]

## V.

### UNFAIR COMPETITION CLAIMS

In light of our previous discussion, we have decided to vacate the district court's earlier disposition of the unfair competition claims and remand for reconsideration. We express no view on the merits of these claims.

## VI.

### CROSS–APPEAL

The appellees below have cross-appealed because of the district court's failure to receive evidence on three affirmative defenses: (1) laches and estoppel, (2) copyright invalidity, and (3) unclean hands/copyright enforceability. On this appeal, we reverse and remand. The district court should give appellees an opportunity to establish these defenses.

### CONCLUSION

We find no Congressional intent to create a blanket home use exception to copyright protection and that home videorecording does not constitute fair use. In addition, the appellees are legally responsible for the infringing activity. The district court's decision must be reversed and the case remanded for appropriate proceedings. The court should consider the unfair competition claims and the affirmative defenses. If appellants prevail on the defenses, the district court should fashion appropriate relief.

The judgment of the district court is reversed in part, affirmed in part, and the case remanded for appropriate proceedings.

IT IS SO ORDERED.